*Natasha Burak v. Mark Burak, et al.*, No. 97, September Term 2016. Opinion by Hotten, J.

**FAMILY LAW — CUSTODY — THIRD-PARTIES — PERMISSIVE INTERVENTION**

The Court of Appeals held that there is no procedural bar prohibiting a third-party from seeking to intervene in a custody dispute between parents because Maryland Rule 2-214 allows any person to intervene in an action "when the person's claim or defense has a question of law or fact in common with the action." Maryland Rule 2-214(b)(1). The Court also held that because a third-party may only obtain custody of a child over the child's biological parents if the third-party can demonstrate that the parents are either unfit or that exceptional circumstances detrimental to the child exist, the third-party seeking to intervene in an existing custody action must make a *prima facie* showing in his or her pleading that the parents are either unfit or that exceptional circumstances exist. *See McDermott v. Dougherty*, 385 Md. 320, 325, 869 A.2d 751, 754 (2005). The Court concluded that the Grandparents' Motion for Permissive Intervention contained sufficient factual allegations to make a *prima facie* showing that the parents may be unfit or that exceptional circumstances existed.

**FAMILY LAW — CUSTODY — THIRD-PARTIES — UNFITNESS**

The Court of Appeals held that in determining whether a parent is unfit – sufficient to overcome the presumption favoring parental custody in a third-party custody dispute – the court may consider whether: (1) the parent has neglected the child by manifesting such indifference to the child's welfare that it reflects a lack of intent or an inability to discharge his or her parental duties; (2) the parent has abandoned the child; (3) there is evidence that the parent inflicted or allowed another person to inflict physical or mental injury on the child, including, but not limited to physical, sexual, or emotional abuse; (4) the parent suffers from an emotional or mental illness that has a detrimental impact on the parent's ability to care and provide for the child; (5) the parent otherwise demonstrates a renunciation of his or her duties to care and provide for the child; and (6) the parent has engaged in behavior or conduct that is detrimental to the child's welfare. The Court concluded that although several of the hearing judge's findings that served as the basis for his conclusion that the mother was unfit implicated several of the factors above, because the majority of the hearing judge's findings were not supported by the record and were, therefore, erroneous, the hearing judge abused his discretion in finding that Petitioner was an unfit parent.

**FAMILY LAW — CUSTODY — THIRD-PARTIES — EXTRAORDINARY CIRCUMSTANCES**

The Court of Appeals held that the hearing judge erred in applying the seven factors contained in *Ross v. Hoffman*, 280 Md. 172, 191, 372 A.2d 582, 593 (1977), to the facts in the case at bar and, therefore, abused his discretion in concluding that exceptional circumstances existed in this case. The hearing judge erred in finding that the "length of time" the child at issue "had been away from" Petitioner was "whenever they were going to do some tripping[]" because the first *Hoffman* factor only applies to circumstances where a biological parent has given constructive custody of the child to a third-party over a long period of time, and ample evidence was presented reflecting that Petitioner has been an active custodian of the child since he was born. The hearing judge also erred in concluding that the Grandparents had assumed care of the child "from the time of [his] birth[]" because he ignored the facts presented at the hearing reflecting that Petitioner has been continuously and actively involved in the child's care since birth. The hearing judge also erred in drawing the conclusion that if the child remained in Petitioner's custody, he would likely fail or continue to be in crisis because ample testimony presented indicated that Petitioner was responsive to the child's behavioral difficulties and was actively working with both the child's school and her own therapist to identify ways to help the child address his behavioral issues. The hearing judge also erred in failing to make substantive factual findings in regard to the third *Hoffman* factor, which considers the "possible emotional effect on the child of a change of custody," and the fourth *Hoffman* factor, which considers the "period of time which elapsed before the parent sought to reclaim the child." *Hoffman*, 280 Md. at 191, 372 A.2d at 593. The Court concluded that the hearing judge did not err in finding that the child's relationship with his Grandparents was "extremely strong" and the Court deferred to the hearing judge's determination that there was no "intensity or genuineness" on Petitioner's part in having custody of the child. *See id.* *See McDermott*, 385 Md. at 325, 869 A.2d at 754.

Circuit Court for Montgomery County
Case No. 112675-FL
Argued: June 2, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 97

September Term, 2016

_____

NATASHA BURAK

v.

MARK BURAK, *et al.*

_____

Barbera, C.J.,
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Hotten, J.
Watts, J., joins in judgment only.
McDonald and Getty, JJ., dissent.

_____

Filed: August 29, 2017

We consider whether the Circuit Court for Montgomery County properly determined that the grandparents of a minor child may intervene in a custody action between the child's parents and whether the circuit court abused its discretion in concluding that the mother was unfit and that "exceptional circumstances" existed in the present case that were sufficient to overcome the constitutional presumption favoring parental custody and authorized the circuit court to grant custody of the child to the grandparents pursuant to the "best interests of the child" standard. We also consider whether the circuit court properly excluded consideration of the grandparents' financial resources in determining child support and whether the amount of child support the circuit court required the mother to contribute to the care of the child was correct.

Natasha Burak ("Petitioner") and Mark Burak ("Father") were married in October 2006, and had a child ("the Child") two years later. From early 2009 until December 2012, Petitioner, Father, and another woman – "M" – engaged in a polyamorous relationship and illicit drug use. The parties scheduled their activities on a calendar kept by Petitioner and, prior to engaging in any illicit activity, the parties would take the Child to his paternal grandparents' house. In 2011, Petitioner and Father purchased a marital home in Silver Spring, Maryland with funds provided by Father's parents – Gary and Martha Burak ("the Grandparents") – and sometime in 2012, M moved into the basement of the marital home.

Beginning in September 2012 and continuing until February 2013, the triad attended couples counseling because Petitioner no longer wanted to engage in sexual relations with M and she wanted M to leave the marital home. In December 2012, the sexual relationship between Petitioner and M ended, but the two continued to have a non-sexual relationship

4

that included cooking together and sleeping in the same bed. On May 31, 2013, in response to two violent incidents that occurred earlier in May 2013, Petitioner filed for and received a Temporary Restraining Order ("TRO") against Father. Father subsequently moved out of the marital home and Petitioner filed a complaint for absolute divorce on July 11, 2013.

On January 14, 2014, a *pendente lite* consent agreement reached by the parties was placed on the record. Pursuant to the agreement, Petitioner was granted custody of the Child, but Father retained visitation rights that were supervised by the Grandparents. Petitioner and Father were also required to undergo random drug testing and attend therapy. Father passed all his subsequent drug tests, but Petitioner tested positive for marijuana in one of the tests. On February 20, 2014, the custody evaluator issued her report, recommending that Petitioner have custody of the Child with Father continuing to have a right to visitation, both parties receive a mental health evaluation and a psychiatric consultation, and both parties continue to be subject to random drug testing.

On April 24, 2014, the Grandparents filed a motion to intervene in the custody action between Petitioner and Father, seeking custody of the Child in light of Petitioner and Father's illicit drug use and given the strong role that the Grandparents had played in the Child's life since birth. Petitioner opposed the Grandparents' intervention, but the circuit court granted the Grandparents' motion on July 25, 2014. Also in July 2014, Petitioner's biological daughter's adoptive family ("the Ks")[1] moved into the marital home with Petitioner and the Child.

---

[1] The Ks include Mr. and Mrs. K, and their biological daughter.

5

Beginning in May 2014, at the end of the Child's kindergarten year, the Child began exhibiting negative and disruptive behavior in class. The bad behavior continued through the summer and into the start of the Child's first grade year, when the Child began to leave class without permission and exhibit bouts of anger. On September 4, 2014, the Child kicked the assistant school principal and threatened to blow up the school. The school contacted Petitioner and provided a referral to the Montgomery County Crisis Center ("Crisis Center").[2] The Child was subsequently allowed to return to school after the referral was completed.

Between September 15 and September 19, 2014, the circuit court held a custody hearing. Thereafter, the circuit court issued an oral ruling, finding that both Petitioner and Father were unfit parents and that exceptional circumstances existed in the case. The circuit court granted physical and legal custody of the Child to the Grandparents at the conclusion of the hearing but held that both Petitioner and Father retained the right to visitation. The circuit court entered an interim order on September 30, 2014 that granted physical and legal custody of the Child to the Grandparents, required Father to pay $500 per month in child support to the Grandparents, and stated a hearing would be set before a magistrate to determine Petitioner's child support obligations. On December 31, 2014, the Grandparents filed a Motion for Child Support in the circuit court. After a hearing on

---

[2] The Crisis Center provides crisis services, including emergency psychiatric evaluations, full crisis assessments, and treatment referrals for both psychiatric and situational crises. *See* DEP'T OF HEALTH & HUMAN SERVICES: 24 HOUR CRISIS CENTER, https://perma.cc/ENB5-8LHY (last visited: June 23, 2017).

March 11, 2015, the magistrate issued recommendations for child support on March 24, 2015. The magistrate determined that the Grandparents were under "no legal obligation" to contribute to the Child's care, and recommended that Petitioner pay $1,467 per month due to her adjusted gross income and due to the "extraordinary medical expenses" that were claimed by the Grandparents for the Child's psychiatric and psychotherapeutic care. The magistrate also recommended that the interim order be modified to require Father pay $629 per month based on his unemployment benefits and due to the Child's "extraordinary medical expenses." On May 26, 2015 the circuit court entered an order granting the Grandparents' motion and ordered Petitioner to pay $1,467 per month in child support and increased Father's child support obligation from $500 to $629 per month. On June 19, 2015, Petitioner appealed the circuit court's decisions to the Court of Special Appeals. On December 7, 2016, in a reported opinion, the Court of Special Appeals held, *inter alia*, that (1) the circuit court did not abuse its discretion when it granted the Grandparents' motion for permissive intervention, (2) the circuit court did not abuse its discretion when it found that exceptional circumstances existed in the case at bar; and (3) the circuit court did not abuse its discretion in awarding child support to the Grandparents. *See Burak v. Burak, et al.*, 231 Md. App. 242, 150 A.3d 360 (2016).

For the reasons that follow, we shall reverse the judgment of the Court of Special Appeals.

## BACKGROUND

### I. Custody Proceedings

On October 7, 2006, Petitioner and Father were married. In June, 2008, their child was born. In late 2008, Petitioner and Father met M in their apartment complex and the triad developed a friendship. Soon thereafter, Petitioner and Father approached M about beginning a consensual polyamorous relationship with them, which commenced in early 2009.[3] At the time the polyamorous relationship began, Petitioner informed M that she had dissociative identity disorder ("DID")[4] and that, in addition to her main identity, she also exhibited three alternate personalities named Morgan, Adrianna, and Lisa.[5] Additionally, evidence was presented at the custody hearing indicating that, as part of the

---

[3] Petitioner acknowledged that she consented to the polyamorous relationship "to please [Father] at the time." The record also indicates that Petitioner continued to have a sexual relationship with an ex-boyfriend, and that they had sexual relations between three and six times while Petitioner was also engaged in the polyamorous relationship with Father and M.

[4] The Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"), states that the defining feature of DID is the presence of two or more distinct personality states or an experience of possession. Am. Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th Edition 2013), https://perma.cc/TW2S-7SEW (last accessed: July 5, 2017). The DSM-V also explains that the overtness or covertness of these personality states will vary as a function of "psychological motivation, current level of stress, culture, internal conflicts and dynamics, and emotional resilience. Sustained periods of identity disruption may occur when psychosocial pressures are severe and/or prolonged." *Id.* (citation omitted).

[5] Father testified that a week before their marriage, Petitioner told him that she had been diagnosed with DID and disclosed the identities of her three alter egos to him. Father also stated that he had observed Petitioner shift into the different alter egos, with the most frequent being Morgan whom he referred to as the "protector." The record reflects that Petitioner was never officially diagnosed by a therapist with DID.

parties' couples counseling, *see infra*, Petitioner wrote a needs and wants list that reflected her needs and wants as well as those of Morgan and Adrianna. Petitioner testified that Father coerced her into writing Adrianna's portion of the needs and wants list by "threaten[ing] to take certain things away," including taking away the Child. Petitioner also acknowledged the existence of emails she wrote in 2006 that referred to Morgan, but stated that Morgan was a nickname she had been given to her by friends and that she used the name in role-playing activities she engaged in with Father. Another email from 2008 that was allegedly sent by Petitioner referenced that Adrianna was "refusing to come out[.]" Petitioner testified she was not sure whether she wrote that email or not because Father had access to the email account that the email was sent from.

In addition to the sexual relationship between Petitioner, Father, and M, the three also used drugs together, including marijuana, mushrooms, ecstasy, and cocaine. The three would schedule their drug use and sexual relations to allow Petitioner and Father to coordinate childcare with the Grandparents in the Grandparents' home. Testimony from the custody hearing reflects that the drug use and sexual relations would occur "[a]nywhere from every other weekend to once a month, to sometimes it would be a few months." Petitioner also maintained a calendar that recorded the parties' drug and sexual relations schedules.

On June 11, 2011, with money given to them by the Grandparents, Petitioner and Father purchased a five-bedroom home in Silver Spring, Maryland. Sometime in 2012, M moved into the marital home with Petitioner, Father, and the Child, and the parties

continued their polyamorous relationship and drug use.[6] The parties also divided up chores, M would sometimes babysit the Child while Petitioner and Father worked, and the parties rotated cooking dinner.

Father testified that the marital relationship became increasingly strained during 2012, and that he and Petitioner engaged in verbal altercations that involved name-calling and screaming. Between September 2012 and February 2013,[7] Petitioner, Father, and M participated in couple's counseling.[8] In December 2012, the sexual relationship between Petitioner and M ended,[9] but the couple continued having a relationship that included

---

[6] The record indicates that the parties would sometimes smoke marijuana and engage in sexual relations while the Child was in the house, but the Child was either asleep or he was in his bedroom at the time of the activity. Father and M both testified that the Child never walked in on the parties while they were using drugs or engaging in sexual relations. M acknowledged, however, that the Child would sometimes come into the bedroom when all three were in bed together and that the Child was aware of the parties' various sleeping arrangements. M also acknowledged that the parties' kept sex toys in the marital home, but stated that they were confined to her bedroom in the basement, and that the Child was supposed to knock before entering her bedroom.

[7] The parties' stopped attending couple's therapy in February 2013 when Father stormed out of a session after Petitioner stated that she wanted M to move out of the marital home and the therapist agreed.

[8] Father only agreed to attend counseling if M could also participate.

[9] At the custody hearing, an email was produced that was sent from Petitioner to M with Father cc'ed on February 4, 2013. The email detailed the dates and times for introductory courses on bondage discipline submission and masochism ("BDSM"). Father testified that he, Petitioner, and M attended one of the introductory classes together and that he and M attended a separate class with just the two of them. M stated that Petitioner and Father were not really involved in BDSM activities together.

10

cooking, cuddling, watching television together, and sleeping in the same bed. Father and M continued to have a sexual relationship.

On May 24, 2013, Father, Petitioner and M went to King's Dominion. Near the end of the day, an argument ensued between Petitioner and Father that involved screaming, and devolved into violent actions taken by both parties.[10] On May 30, 2013, the parties got into another fight, and Petitioner testified that:

_____

[10] Petitioner and Father disagree regarding the circumstances of the fight. Petitioner testified at the custody hearing that:

> [Father] and I ended up getting into a fight at the end of the day that started off in the car. I had gotten out of the car to stretch, because I had gone to the car instead of being in the park. Since they had gone off and, and I mean they by [Father] and [M], had gone off and done their own thing.
>
> I had gotten out of the car to stretch, and [Father] basically got physical and violent. Pushing me down to the ground to the point where I had to bite him to get out. I had gone to close the car door without realizing that his hand was in there. So it was a huge, big fight. [Father] had smacked me and then I had gone to the other side of the car and gotten in. To where he was verbally screaming at me. Telling me that, you know, he should have hit me harder and that he didn't really want me alive, to be honest.
>
>                  \*      \*      \*

Father testified at the hearing that:

> We had a really good day up until the very end. I forget what the skirmish was about. There was a disagreement. [Petitioner] walked off. [M] walked off. I chased after [Petitioner]. We were supposed to meet at a certain spot, if we got separated. She wasn't there. I went back to the car and we had a, a – I got in the backseat of the car. She was in the front seat in the driver's seat. We screamed at each other. We were cussing at each other. She got out of the front seat of the car and said do not follow me. And walked beyond the, the front of the car. I got out of the car to try to get into the driver's side of the car. It was my car.
>
>                                                          (continued . . .)

[W]hen we went to go take [the Child] to daycare and go to work, since we working together at the time, he, we were bickering most of the morning, and then when we got into the car, on the way to daycare, he threatened to kill me twice in front of my son. And then when I dropped [the Child] off, that's when the concern was raised by my son in regard to the arguments.

\* \* \*

Father conceded that the two got into an "ugly and vicious[]" argument that morning, but testified that "[i]t was no different from 10,000 other fights we'd had before[]" and he stated that he never threatened to kill Petitioner. On the same day, in response to these two incidents, Petitioner filed for and received a Temporary Restraining Order ("TRO") against Father in the Circuit Court for Montgomery County. On June 6, 2013, the circuit court issued a Final Protective Order that found by clear and convincing evidence that Father had assaulted Petitioner and ordered that Father not contact Petitioner or the Child for one year, but also authorized supervised visitation at the Grandparents' house.[11] Father was also ordered to vacate the marital home, which he subsequently did. M remained in the house with Petitioner and the Child until the end of June 2013.

---

(. . . continued)
She turned and charged the car and slammed my door, slammed the door on my arm. I was pushing the door back and forth with her and she bit me and I smacked her.

\* \* \*

[11] The record reflects that on September 26, 2013, Father filed a Petition to Modify/Rescind Protective Order, which was granted by the circuit court, after a hearing, on November 15, 2013. On January 22, 2014, Father filed a Second Petition to Modify/Rescind Protective Order, which was granted by the circuit court, after a hearing, on March 7, 2014.

On July 11, 2013, Petitioner filed a Complaint for Absolute Divorce in the Circuit Court for Montgomery County.  On August 27, 2013, Father filed an Answer to Petitioner's Complaint for Absolute Divorce and a Counter-Complaint for Limited Divorce, or, in the Alternative, Absolute Divorce, Custody, Child Support, Monetary Award, Attorneys Fees and Other Relief.  Petitioner filed an Answer to Father's Counter-Complaint and sought an emergency *pendente lite* hearing seeking temporary alimony, counsel fees and other relief.

On January 14, 2014, a *pendente lite* consent agreement reached by the parties was placed on the record. [12]  The agreement stated that: (1) Petitioner would maintain physical custody of the Child; (2) Father was entitled to visitation with the Child on Tuesdays and Thursdays after school until 8 p.m., with the Child to be picked up by the Grandparents; (3) the Child would alternate weekends between Father and Petitioner from Saturday at 9:30 a.m. to Sunday at 7:30 p.m. with transportation to be provided by the Grandparents; (4) Father and Petitioner were required to submit to random drug testing organized by the Child's Best Interest Attorney ("BIA"), the testing must be completed within 24 hours, and the results had to be provided to the BIA; (5) Father and Petitioner were required to continue with therapy and the parties agreed to attend therapy at least twice a month; (6) the Child would continue participating in the Safe Start program;[13] (7) Father would

---

[12] On February 28, 2014, the circuit court entered a Consent *Pendente Lite* Order that incorporated, but did not merge, the January 14 transcript reflecting the parties' *pendente lite* agreement.

[13] The Safe Start program is a twelve-week program that helps children in various stages of separation, divorce, and domestic violence disputes.  The program provides
(continued . . .)

continue to pay $500 per month in child support to Petitioner; and (8) attorney's fees would be deferred until the divorce merits hearing. On January 14, 2014, the BIA required both Petitioner and Father to submit to a drug test. Father tested negative for all drugs, but Petitioner tested positive for marijuana. Petitioner tested negative for all drugs on each subsequent drug test, including a test she took on January 24, 2014 – 10 days after her positive test.

On February 20, 2014, the Custody Evaluator issued her report, recommending that: (1) both parties receive a mental health evaluation with a psychiatric consultation regarding medication; (2) both parties receive a substance abuse assessment, including the possibility of random drug testing as part of that assessment; (3) Petitioner have primary residential custody of the Child because she expressed a desire to have custody, she was in therapy, and because she had accommodations for him; (4) Petitioner have sole legal custody of the Child; and (5) Father continue to have visitation with the Child, supervised by the Grandparents. At the custody hearing, the Custody Evaluator acknowledged that Petitioner told her that she had not used any drugs since the parties separated, but noted that Petitioner subsequently tested positive for marijuana on her January 14, 2014, drug test. The Custody Evaluator also acknowledged that Petitioner had not disclosed to her that she had been abused as a child. The Custody Evaluator stated that in her report she was concerned about

---

(. . . continued)
education and counseling to help children deal with conflict resolution, fears, safety planning, peer relations, self-esteem, and guilt reduction. *See* SAFE START KIDS GROUP BROCHURE, https://perma.cc/2LYJ-GFUE (last visited: June 23, 2017).

Petitioner's evasive and defensive responses to her questions, and that Petitioner lied to the Evaluator. The Custody Evaluator also expressed concern that at the time she conducted her report that she did not see additional signs of attachment between the Child and either parent.

On April 24, 2014, the Grandparents filed a Motion for Permissive Intervention in the custody dispute between Petitioner and Father, and attached a copy of their proposed Complaint for Custody with the circuit court. The Motion stated that "[the Grandparents] have been an important and regular presence in [the Child's life.]" In their proposed Complaint for Custody, the Grandparents further alleged:

6. Although [the Child] has "resided" with his parents, and now pursuant to this Court's *Pendente Lite* Order entered February 28, 2014, with [Petitioner], the Co-Intervenors have acted *in loco parentis* for [the Child] since his birth in 2008.

7. Since [the Child's] birth, there have been significant periods of time when [the Grandparents] have cared for [the Child] on a daily basis. At other times, they have had [the Child] in their care for as many as five overnights per week.

8. [The Grandparents] have been active participants in [the Child's] pre-school and elementary school activities, and have participated in parent-teacher conferences for [the Child].

9. In addition to extensive hands-on care for [the Child], [the Grandparents] have frequently paid for [the Child's] work-related child care and other activities.

10. [The Grandparents] have also been actively involved in [the Child's] pre-school and school activities. Likewise, [the Child's] Grandparents have been actively involved in arranging play dates and other activities for [the Child].

11. [The Child's] Grandmother has often been responsible for taking [the Child] to the doctor and other medical appointments, and is knowledgeable about [the Child's] health.

15

12. For the majority of [the Child's] life, up until the entry of the Protective Order, the [Grandparents] cared for [the Child] in order to accommodate the needs and whims of [Petitioner] and [Father].

13. Over time, the [Grandparents] became aware that [the Child's] parents were abusing drugs while [the Child] was in their care. This fact led to an even greater level of involvement by the [Grandparents] in order to protect and shield [the Child] from his Parent's behavior.

14. During the ongoing litigation, a custody evaluation was performed by the Office of the Court's Custody Evaluator. As part of that evaluation, the parties were questioned about their past and ongoing drug use. [Petitioner] reported to the custody evaluator that she was not using any type of controlled dangerous substances, as indicated by the Custody Evaluator during her oral report to the Family Division Master on February 20, 2014 (Docket Entry 98). Both parents were required to submit to drug testing during [t]he course of the evaluation. [Petitioner's] test was positive for marijuana use, contradicting the representation that she was no longer using drugs.

15. [Petitioner] also repeated[ly] states that her drug use was at the behest of [Father], implying that on her own, and left to her own devices, she would not engage in recreational or other illicit consumption of controlled dangerous substances. The positive drug test during the evaluation, when [Petitioner] was no longer under the influence and control of [Father] diminishes the credibility of [Petitioner's] statement regarding her recreational drug use.

16. [The Grandparents'] concerns regarding the Parents' fitness to have custody of [the Child] is echoed by this Court's *sua sponte* decision to order a psychiatric evaluation of [Father] and [Petitioner] (Docket Entry 115).

17. [The Grandparents] are in good health and are physically and emotionally capable of caring for [the Child] on a full time basis.

18. Extraordinary circumstances exist in this matter that warrant placing [the Child] in the residential and legal custody of his paternal Grandparents.

19. [The Child's] best interests will be advanced by placing him in the care and custody of his paternal Grandparents.

\*　　\*　　\*

16

The Grandparents' Complaint requested the circuit court award primary residential and legal custody to them. On May 21, 2014,[14] Petitioner filed a Motion to Strike Grandparents' Motion for Permissive Intervention alleging that the Grandparents had no legal or factual basis for seeking to intervene in the custody action and that the Grandparents' motion contained substantial factual errors that did not accurately reflect the Grandparents role in the Child's life since Petitioner and Father separated. On June 10, 2014, Father filed an Opposition to Petitioner's Motion to Strike Grandparents' Motion for Permissive Intervention. On July 25, 2014, the circuit court denied Petitioner's motion and granted the Grandparents' Motion for Permissive Intervention. The circuit court designated the Grandparents as intervening counter-plaintiffs to the custody action. On July 28, 2014, the Grandparents filed the Complaint for Custody that had been attached to their motion for permissive intervention. On August 4, 2014, Father filed his Answer to the Grandparents' Complaint for Custody and on August 18, 2014, Petitioner filed her Answer to the Grandparents' Complaint.

In July 2014, Petitioner's biological daughter and the Ks moved into the marital home with Petitioner and the Child. The Ks also brought several dogs and between fifteen and twenty-five guinea pigs.[15] Petitioner and Father both acknowledged that the Child had

---

[14] Father filed a Response to Grandparents' Motion for Permissive Intervention on May 2, 2014.

[15] M testified at the custody hearing that the Ks lifestyle was unclean and that they were hoarders, but acknowledged she had never been to the Ks home and that she had only

(continued . . . )

a close relationship with Petitioner's biological daughter, but Father expressed concern regarding the closeness of the Child to the Ks, whom the Child was not related to.[16]

On July 14, 2014, pursuant to the *pendente lite* agreement, the BIA requested Petitioner take a random drug test, but Petitioner did not comply. The BIA also requested that Petitioner take another random drug test on August 25, 2014, which Petitioner took on August 26, 2014. The BIA testified, however, that Petitioner never signed a release to have her drug test results sent directly to the BIA. Instead, the drug test results were sent to Petitioner, who then gave them to the BIA.

On September 4, 2014, Petitioner filed an Emergency Motion to Postpone/Continue Custody Trial Scheduled for September 15, Motion for Order Permitting Discovery, and Motion to Expedite based on the intervention of the Grandparents in the custody action. On September 9, 2014, the Grandparents filed a Response in Opposition to Petitioner's Emergency Motion to Postpone/Continue Custody Trial arguing that Petitioner had actual knowledge of the Grandparents' allegations since April 24, 2014 and, despite the Grandparents' offering themselves to be deposed, Petitioner's counsel failed to schedule any depositions. On September 10, 2014, Father and the BIA both filed Oppositions to Petitioner's Emergency Motion to Postpone/Continue Custody Trial, and on September 11,

---

(. . . continued)
heard that the Ks were hoarders from Petitioner and Father in prior conversations they had. M did not provide any testimony regarding the cleanliness of the marital home before or after the Ks moved in.

[16] Father testified that the Child referred to the Ks biological daughter, who is not related to the Child, as his sister and Father believed that this was confusing for the Child.

18

2014, Petitioner filed a Reply to the Grandparents' Opposition. The circuit court denied Petitioner's Emergency Motion to Postpone/Continue Custody Trial and Motion for Order Permitting Discovery on September 12, 2014.

Also on September 4, 2014, – the same day that Petitioner filed her Emergency Motion to Postpone/Continue Custody Trial – an incident involving the Child occurred at his school. Prior to the incident, the Child had been increasingly disruptive during school. The Child's school principal testified that beginning around May 2014, when the Child was in kindergarten, he refused to leave the kindergarten classroom with the other students to attend "specials[]"[17] on several occasions and would walk around the room, push desks, become angry and his behavior began to escalate. To address these behavioral concerns, the school had the Child run errands when the other children left for specials and then he would meet them in the specials classroom. Additionally, over the summer, the Child was enrolled in a summer-long camp that had been paid for by Petitioner, but Petitioner testified that the Child had to be pulled out of camp early due to behavioral problems he was experiencing, in combination with him wanting to spend more time with the Ks' children.

Upon returning to school in late August, the Child's behavior continued to escalate and he began to leave class, run around the building, and show signs of anger.[18] On the

---

[17] "[S]pecials" refers to art, music, and physical education classes.

[18] The principal of the school testified that

[The Child] continues to run around. He sometimes say[s] it's a game, or he'll get very close to us and he gets very, he gets angry and he'll, he'll squeeze his fists and his whole body tenses up and he clenches his teeth. And

(continued . . .)

19

afternoon of September 4, 2014, the Child's behavior escalated to the point where he kicked the assistant principal and he told the guidance counselor that he was so angry he wanted to blow up the school, and he was going to make it bad for everybody at the school. In response, the school determined that because the Child was showing such anger, was not able to de-escalate, and made a threat against the school that a referral to the Crisis Center was the appropriate course of action.

The school called Petitioner and asked her to come to the school to discuss the Child's behavior. Because the incident occurred on a Thursday near dismissal time, and because Father had court-ordered visitation with the Child on Thursday evenings at the Grandparents house, both Petitioner and the Grandmother arrived at the school around the same time. The principal met with Petitioner alone, at her request, and they discussed how the Child's behavior had escalated throughout the day culminating in his becoming violent and issuing a threat against the school. The principal explained that the guidance counselor

---

(. . . continued)

> he'll say, I don't have to listen to you, you're not the boss of me. I will give him a direction, and I'll say, you have a choice, you can return to your class, or you can walk with me to the office. And he'll say things like, or there's a third choice. And I'll say no, you don't have a third choice. These are the two options. I'm not listening to you, you're not the boss of me, I don't have to listen to you, I'm going to do what I want
>
> So those are some of the experiences. When we've had in the counselor's office or in my office, again, he'll show anger. He'll not want to listen to us. He has pushed furniture.
>
> *    *    *

20

had a Crisis Center referral for the Child, and the principal encouraged[19] Petitioner to take the Child to the Crisis Center. The principal also told Petitioner that she needed to have the Crisis Center complete the referral form and return the form to the school. After meeting with the principal, Petitioner met with the guidance counselor and received the Crisis Center referral. The guidance counselor explained to Petitioner that the school prefers the student to go as quickly as possible to the Crisis Center after they are dismissed from school.[20] Petitioner did not take the Child to the Crisis Center and, instead, allowed the Grandmother to take the Child with her for visitation. Petitioner did not tell the Grandmother about the Child's behavior or the Crisis Center referral she had just received.

Later that afternoon, Father learned of the Crisis Center referral from his attorney and called the Grandparents to determine whether the Child had been taken in for an assessment. The Grandmother did not know about the referral, but upon learning about it, she took the Child to the Crisis Center where she met Father and the Crisis Center evaluated the Child.[21] Neither the Grandmother nor Father informed Petitioner that they had taken

---

[19] The principal acknowledged at the custody hearing that she could not answer whether she suggested or implied to Petitioner that Petitioner take the Child to the Crisis Center immediately, but the principal also stated that she told Petitioner "[i]t's very important that [the Child] be seen by somebody. He's making these types of threats to the school, and to himself. We're concerned about the safety of [the Child] and others."

[20] Petitioner testified that when she met with the guidance counselor, she was directed to take the Child to the Crisis Center after he returned from visitation, because the visitation was court-ordered and the guidance counselor did not want to interrupt what had already been set up.

[21] Petitioner testified at the custody hearing that she made arrangements to take the Child to the Crisis Center after the Child returned from visitation. The record also indicates

(continued . . .)

the Child to be evaluated at the Crisis Center and they did not provide Petitioner with the completed referral form. While the Child was at the Crisis Center, Petitioner attended the Child's back-to-school night, which the Grandfather also attended.

Petitioner testified that the Child did not return to school on Friday, September 5 because she had been referred to Children's Hospital from the Crisis Center,[22] and they had not been "released from Children's Hospital until 2:30 a.m. in the morning and the attending pediatrician and the attending psychologist suggested that [the Child] should be able to sleep in and have a day of rest at home."[23] A Crisis Center employee refuted some of Petitioner's testimony by stating that the Child had only been brought to the Crisis Center once and it was the Child's Grandmother who brought him in, with Father joining them shortly thereafter. The record indicates that Petitioner did take the Child to Children's Hospital in Washington, D.C. the night of September 4, 2014 and that they arrived at the hospital by 9:15 p.m. Petitioner stated that the Child was asked questions upon arriving at the hospital and then they met with a psychiatrist, a pediatrician and a social worker. The

_____

(. . . continued)
that the principal inferred from her conversation with Petitioner that Petitioner did not feel she could take the Child to the Crisis Center until after the Child's visitation with Father was over. There is no evidence in the record, beyond Petitioner's own testimony, that she actually took the Child to the Crisis Center.

[22] Petitioner testified that she had taken the Child to the Crisis Center between 8:30 and 8:45 p.m. on September 4, 2014.

[23] Petitioner testified at the custody hearing that the principal had asked her to attend back-to-school night so she allowed the Child to go with the Grandmother for visitation. Petitioner's testimony was refuted by the principal who stated she never told Petitioner it was important for her attend the back-to-school night on September 4, 2014.

record also indicates that Petitioner testified that the Child returned to school on Monday, September 8 and was present from the beginning of school until before lunch, but left due to an issue with his health.[24] The attendance records provided by the school indicated, however, that the Child did not return to school until Tuesday, September 9.

The custody hearing in the present case was held from September 15 to September 19, 2014 and the circuit court issued its ruling orally on September 19. Petitioner's witnesses included Petitioner, the Custody Evaluator, Petitioner's therapist, the Child's school principal, and the school guidance counselor. Father and the Grandparents' witnesses included Father; both Grandparents; M; the psychologist who worked with Petitioner, Father, and M in couple's therapy; the Crisis Center employee who completed the Child's assessment; the Grandparents' neighbor; and a member of the same church the Grandparents attended.

In addition to the facts discussed, *supra*, testimony from the custody hearing revealed that the Grandparents were heavily involved in the Child's life. Prior to the separation, the Child spent a substantial amount of time at the Grandparents' house, including several times a week and occasional weekends based on the drug and sexual relations schedule organized by Petitioner, Father, and M. After the separation, the Child continued to see the Grandparents regularly. The Child also had his own room at the

---

[24] The school guidance counselor testified that on the morning of Monday, September 8 Petitioner called her to tell her the Child had been aggressive toward her and she felt it was unsafe for the Child to be at school.

Grandparents' house where he kept his toys and books purchased for him by the Grandparents.

The Grandmother noted in her testimony that she and the Grandfather were the caretakers for the Grandfather's bedridden father and for the first eighteen and a half years of their marriage they drove to New Jersey every third weekend to help the Grandfather's mother care for the Grandfather's father. The Grandmother also stated they cared for the Grandfather's mother in their own home while simultaneously caring for the Child, and that the Grandfather's mother suffered from a litany of ailments, including Alzheimer's, lymphoma, neuropathy, cataracts, and deafness.

Over the years, the Grandparents also involved the Child in a variety of activities, including enrolling him in swimming lessons, arranging for the Child to attend Little Gym,[25] and taking him to church on Sundays. The Grandparents also took the Child on day trips to Brookside Gardens and the county fair, and Petitioner allowed the Child to go on several vacations with them, including, most recently, to the Outer Banks in the summer of 2014. The record also reflects that although the Grandparents had previously taken the Child to see family in Mississippi during the Child's spring break in 2013, Petitioner refused to allow the Child to go to Mississippi with them during his spring break in 2014. The Grandparents would also participate in the Child's doctor's appointments, at times

---

[25] The Grandparents arranged for the Child to attend Little Gym once a week from September 2011 to February 2012. At Little Gym, the Child would do stretching activities, tumbling, climbing, and balancing.

attending with Father and Petitioner, and sometimes taking the Child to the doctor's appointments alone.

When the Child was two years old, the Grandparents also gifted the Child with tuition for one year at the Silver Spring Day School ("SSDS"),[26] and provided daycare during the afternoons while Petitioner and Father were at work. After the Child's first year at SSDS, Petitioner found and enrolled the Child in a different program through the Montgomery County Childcare Association ("MCCA"), with financial contributions made by the Grandparents. During that next year, the Child split time between SSDS and MCCA, spending three days a week at MCCA and two days a week at SSDS. The Grandparents volunteered their time approximately once a month as teaching assistants at SSDS while the Child was enrolled there, and when the Child began attending MCCA, the Grandparents continued to volunteer their time, reading and reciting poetry to the children.[27]

---

[26] The Silver Spring Country Day School is a yearly preschool program that runs from 9:30 a.m. in the morning until initially noon, and after the enrollees adjust, to 1 p.m.

[27] At the hearing, Petitioner testified that the Child repeatedly came home from the Grandparents' home with rashes or nosebleeds, but the Grandparents did not inform Petitioner of the source of the problem. Petitioner acknowledged that the Child had historically experienced nosebleeds. Petitioner also testified that after the separation, she became concerned regarding aspects of the Child's safety in the care of the Grandparents and the Grandparents repeated failures to communicate with her regarding the Child. Petitioner acknowledged, however, that after the separation she also stopped communicating with the Grandparents regarding the Child's care and medical needs.

The record from the custody hearing also reflected that Petitioner was a responsive parent and actively sought to address the Child's escalating behavior.[28] The Child's school principal testified that beginning the second week of school, Petitioner asked questions regarding the Individualized Education Plan ("IEP") process as a way to address the Child's escalating behavior because she felt the Child needed more one-on-one or individualized attention. Additionally, at the time of the custody hearing, the school was evaluating how best to help the Child manage his behavior, and had implemented a behavior contract to begin collecting data on the Child's conduct.[29] In addition to the

_____

[28] Father testified that Petitioner could not handle the Child when she was alone with him and would become frantic if left alone with the Child for long periods of time. Father also testified that he usually came home to Petitioner and the Child screaming at each other and if he left, Petitioner would beg for him to hurry back as soon as possible. Father also stated that Petitioner could not discipline the Child due to her previous childhood trauma, and she had difficulty changing the Child's clothes or bathing him.

M testified that she observed Petitioner yelling at the Child over seemingly minor incidents such as forgetting to throw away the recycling materials. M also stated that Petitioner and the Child would get frustrated with each other, Petitioner had issues controlling the Child, the Child refused to listen to her, and that she needed help taking care of him.

[29] The principal explained:

[PRINCIPAL]: So [t]he first step in the process is calling a screening. So what we do is we come to the table with parent input, teacher input, and observation from another teacher in the building, and an educational history. The special educator is involved in that screening meeting, and at the table we decide the next steps. Whether we decide that we need educational testing, psychological testing, or anything else.

[PETITIONER'S ATTORNEY]: And will that be for more than just whether an IEP is appropriate or not?

(continued . . .)

26

evaluative process, Petitioner also requested that the Child be enrolled in the Linkages to

Learning program.[30]  The principal also testified that Petitioner attended almost every

---

(. . . continued)

> [PRINCIPAL]: That is to determine the next step. So maybe –
>
> [PETITIONER'S ATTORNEY]: Okay
>
> [PRINCIPAL]: – it's an intervention program. Maybe it's a behavior contract, maybe it's further testing for the special education identification process. But all of that is talked at, about at that table during the screening meeting.
>
>    *   *   *
>
> [PRINCIPAL, cont.]: – can I say – we have started the process of a behavior contract. So with any interventions, that takes about six weeks to collect that data. So we have started a behavior contract to, to collect data on his work completion and following, excuse me, following directions and remaining in his assigned location. So that data collection has just started at the beginning of last week ….
>
>    *   *   *
>
> [PETITIONER'S ATTORNEY]: And on this entire process you're talking about, you've had the discussion with [Petitioner]?
>
> [PRINCIPAL]: We've discussed about the behavior contract.
>
>    *   *   *
>
> [PETITIONER'S ATTORNEY]: And has [Petitioner] cooperated and provided all the information and disclosures and signatures that's necessary?
>
> [PRINCIPAL]: As far as I know, yes. I asked [the Child's teacher], are the contracts going home and coming back, and she said yes. And sometimes there are notes from [the Child's teacher], and I think [the Child's teacher] said sometimes there are notes from [Petitioner].
>
>    *   *   *

[30] The school principal explained that the Linkages to Learning program is provided to schools that have a high number of students living in poverty and provides wrap around services for the student and the family.  The program has a mental health provider, case manager, and a coordinator so if the family is displaced the program can support the needs of the family.

school function, she was very responsive when the school contacted her regarding the Child and would come to the school when requested "[a]t the drop of a hat."[31]  Petitioner's therapist also testified that approximately fifty percent of Petitioner's treatment involved answering Petitioner's questions about parenting, and that Petitioner sought her advice and referrals for a qualified therapist to help the Child.[32]  The record also indicates that Petitioner paid for the Child's before and after care at MCCA, totaling $405 per month, and when the Safe Start program ended she sought to re-enroll the Child in the program because she felt it was beneficial to the Child.

In their testimony, the Grandparents both acknowledged that Petitioner was involved in the Child's care.  The Grandfather noted that although he had discussed getting

---

[31] Petitioner's responsiveness to the school was corroborated by the school guidance counselor who testified that every time she had a concern with the Child and she called Petitioner, Petitioner was "very responsive and ready to come up to school whenever need be."

[32] The record indicates Petitioner and her therapist had located a child psychologist they felt fit with the Child's needs, and had planned to take the Child to be examined on September 11, 2014.  The appointment was cancelled because Father did not consent to the Child being seen by that psychologist.  Father stated that he refused to give his consent because he felt the service recommended by the BIA – the National Family Resiliency Center ("NFRC") – was a better fit.  The NFRC provides counseling and educational programs to help children cope, heal, and navigate through divorce and other family transitions.  *See* NAT'L FAMILY RESILIENCY CENTER, https://perma.cc/4R2J-ECBD (last visited: June 23, 2017).  Father testified that he had repeatedly called the NFRC and had spoken to the executive director twice.  The BIA noted that, although she had provided the contact information for the NFRC to Petitioner on July 30, 2014, Petitioner did not contact the NFRC until August 28, 2014.  Additionally, although the BIA presented evidence that an appointment had been scheduled for the Child on September 9, 2014, Petitioner testified that she never received notice that the appointment had been scheduled and, therefore, did not take the Child in for the appointment.

28

back-to-school items for the Child with Petitioner, she had "pretty much taken care of most of those items." The Grandmother testified that when the Child's previous part-time caretaker retired, Petitioner identified another part-time caretaker that the Child stayed with two days a week. The Grandmother also acknowledged that Petitioner organized all the Child's doctor's appointments and then coordinated the dates with the Grandparents. The Grandmother also noted that although she and the Grandfather hosted several of the Child's birthdays, the parties were planned with Petitioner's and Father's input and Petitioner and Father hosted, planned, paid, and prepared the Child's fourth birthday party at the marital home.[33]

The record also indicates that Petitioner was gainfully employed and worked a flex schedule, but her hours were mostly Monday through Friday from 9:00 a.m. to 5 p.m. Petitioner acknowledged that the Child gets off school at 3 p.m. and that when he is in her care he goes to before- and after-care until she is able to pick him up. Petitioner testified that she typically dropped the Child off in the morning between 7:45 and 8 a.m and would pick him up anywhere between 5:30 and 6 p.m. on days that he was in her care. Petitioner noted that on Tuesdays and Thursdays the Grandparents pick the Child up from school at 3:30 p.m. for court-ordered visitation and they drop him off at Petitioner's home at 8 p.m.[34] Petitioner testified that after the Child's behavior on September 4th, she had been making

---

[33] Despite the acknowledged role that Petitioner had in the Child's life, the Grandmother testified that she did not think that either Petitioner or Father was "prepared financially, socially, morally, to raise [the Child] in a[n] environment that will help [the Child] to be the person that he has the potential to be."

[34] The Grandparents also have visitation with the Child every other weekend.

it a priority for her to take the Child to school when school starts and pick him up when school lets out so that he did not have to attend before- or after-care. Petitioner stated she was able to adjust her schedule due to work-from-home opportunities, but that she did not know whether she would maintain that schedule, she stated it would depend on the Child's needs.

At the conclusion of the custody hearing, the circuit court issued an oral ruling. The hearing judge found that Father was an unfit parent and concluded that: (1) Father's commitment to remain drug free was not clear; (2) the Child could be exposed to the polyamorous and sadomasochistic activities that Father continued to engage in; and (3) the Child would continue to be exposed to violent fights between Father and Petitioner.

The hearing judge also found Petitioner was an unfit parent and that extraordinary circumstances existed sufficient to rule that the Grandparents should receive both physical and legal custody of the Child. In finding that Petitioner was an unfit parent, the hearing judge concluded:

> With respect to [Petitioner], she lied throughout this case. Now, you can make an argument, was it [Petitioner] lying or was it Morgan or was it him – I don't know. But it was certainly the woman on the stand and it was certainly the woman that had all these other incidents before. And she lied about drug usage and testing. She said she was forced to have sex with [M]. That's been disproved. She lied about her different identities. That's been disproved. She's been caught in all these lies. She lied about taking her son to school on September 8th. And these are so many things that she'd have to – if she was intelligent enough – think well, I'm going to get caught on those. I either took the child to school on September 8th or I didn't. And then she said, well, I took him there for part time.
>
> And somebody that continuously lies under oath and lies to the [BIA] and doesn't do all the things that the [BIA] wants her to do – once she's under the microscope, you'd say, wow, how could she ever be trusted at a later

30

date? And she's under oath when she's saying these things. She was forced to take these drugs – I don't find that at all. I find she clearly took the drugs voluntarily. In fact, her husband was sending her some research on some of these drugs. It seems like that was one of their big hobbies, finding new drugs and new ways to trip or get high or hallucinate – all against the law, by the way. All detrimental to the marriage, not to even mention what it does to raising a child.

And whether or not she has [DID] or not, I don't know. But I agree with [Father's attorney] that if she has it, it's a big problem. If she doesn't have it, it's a big problem. Because she's acting as if she does. And she's impersonating several different people.

And one that was never rebutted – that Morgan might hurt the child. She talked about visions of Morgan cutting the baby out of her stomach. And then we hear these things that haven't been rebutted with respect to that she couldn't see her son naked or in the shower, which is about as natural as possible for a mom with a little guy, bathing him – even before they're even ready for showers. Weird, odd, bizarre, troubling – yes, all of the above.

And you throw in this other family living in her home? How thoughtful of that is her son when she's got also her own natural daughter and adoptive mother there as well and then the little boy, [the Child], is calling both of them his sisters. And then you've got the other two living in there. And then you throw in all the animals. It's about as chaotic as possible. And I know full well why [Petitioner] didn't want the [BIA], to see the inside of that house. She probably would have got sick if she had walked in there. And that's where you're raising a child and two girls and a little boy?

And there again, you would think – all right, here I am a mom or a dad. I've got the court watching me. I've got the [BIA] – I want to do everything I possibly can to at least fool people, even if I'm not sincere. But she did just the opposite. It was business as usual with her. In fact, she made it worse. Her selfishness was then passed on to [the Child] even more when he couldn't take the trip to Mississippi with his grandparents. And the grandparents – she had no axe to grind with them.

And the incident on September 4 – well, there's a total manifestation of how much trouble this guy is in. Because it's not typical. He's in major, major trouble when you're threatening to blow up a school and punch a vice principal at the age of six in the stomach? That's unheard of. Those are the kids that we send here to the Finan Center to give them intense examination when they're in the juvenile delinquent system. These are kids that probably

31

have little chance of making it, because they don't have a family to go back to for the most part.

And yes, on that day any mother worth her salt would tell first of all the grandparents and do everything she could to address the problem. My son did what? We've got to address this right now. But hand him off to the grandmother and not say anything? That's just bizarre. What kind of love does she have for her son? What kind of interest does she have for the son? It's like my shift's over, somebody else worry about it. I'll punch out. I'm at the factory. I didn't finish what I was supposed to do today, but the next worker can take over. Grandma can go take over. That's the attitude she displayed.

Then you add – and I don't believe her also that she's changed the work schedule that she has, because I don't believe anything else she said. So that child is dropped off at 7:45 to 8:00 every morning and picked up 5:30 to 6:00. If it is truly from 8:00 to 6:00, that's ten hours a day for a kid that's in major crisis. I would like to think a parent would quit their job if they had to, to deal with that problem with a child. It's no different than if that child was in the hospital with two broken arms, two broken legs, or in a coma. You have to make adjustments.

I don't see any tendency on either one of them – but we're talking about the mother – to make the adjustment that that child needs. That child is in the mental emergency room or should be right now. And that's the way she should be addressing it. And most mothers would try to move heaven and hell to help their child, to do everything they possibly could. But not say anything? Now, I assume she went to Children's [Hospital]. I don't know whether she went out to the county for that or not. But in any event, I don't think there was significant follow[-u]p. And anything she did do in the way of getting some counseling or looking into anything else – I think she was getting good instruction from her attorney, but obviously not following other things. I think if left to her, she wouldn't do anything. Just drop him off at school, he runs around in school, he flips over wastepaper baskets, so what?

And another thing – she makes excuses for everything. Everybody – it was somebody else's fault for everything in her testimony. Never took the blame for anything. And I heard from the grandparents all the things that I would expect to hear from mom. I didn't hear how she said, you know, I just love to put him to bed at night. I like to tuck him in. I like to read him a story. We take little walks together. I like to go through colors with him and numbers with him. He loves to wear this particular sweatshirt. You didn't hear any of that. I didn't see any really love or total attachment. I mean, this is her flesh

32

and blood, her own son. Most mothers would give up their lives for their children in a tragedy. A child fell into a river, they'd dive in. I think in this case, I don't know what she'd do. She might leisurely walk over and make a call. I don't know. But what I've seen from the time this child was born, she's not even acting in the way a babysitter would act. Because if she were the babysitter and she went to school on the fourth and the teacher told her what happened or daycare provider, she'd be calling everybody she possibly could. She'd be calling the mother, she'd be calling the father, she'd be calling the grandparents. Did you hear – let me tell you what the principal said. Schools can't make you do anything now, because that's the way the system is. But certainly when they send a kid to the [C]risis [C]enter, it's major. It's major.

So we've got a mother not only taking drugs – and I find that she still takes them or she's still ready to take them. And she has no appreciation what they've done. I don't find any evidence that she feels terrible about doing all these sex things with her child in the house, because she blames it on her husband. She blames [M] on her husband. She blames the drugs on her husband. She blames the sex on her husband. She says this is a – everybody is making up these personalities. When [the couple's therapist] testified, who did everything she could to help [Petitioner] – she even said that she had personalities.

So I find that the mother is an unfit person to have custody of this little boy. There's no ifs, ands or buts. It's not even a close call. It is overwhelmingly strong and I don't even know if I mentioned everything. But I adopt everything that [Petitioner's] attorney, the grandparents['] attorney, and the [BIA] have said as well. And they all take that position, and the [BIA], who is independent here, makes that finding.

And I truly thin[k] [the Grandparents] are independent, too in finding that the parents are unfit. I value their opinion because they're older, they're wiser, they're stable. And I think they really if anything would lean towards their son or helping him out. But I think they were extremely objective because I think their total focus is on their grandson.

\*　　\*　　\*

In determining that exceptional circumstances also existed in this case, the hearing judge found that:

So I'm also going to find – because this case cries out for it as well – I know it's an or, but the Court of Appeals and [Court of] Special Appeals, I don't know, one day they ma[y] wake up and say it should be and. I find that there's extraordinary circumstances that exist here which are significantly detrimental to the child remaining in the custody of the mother and/or the father. And I've given all those reasons – the drugs, the sex, the craziness in the house, the different relationships, the lack of interest in the mother, the mother lying – all of those things are factors for both.

So once I find that – oh also, factors laid out by the Court in [*Ross v. Hoffman*, 280 Md. 172, 372 A.2d 582 (1977)], exceptional circumstances, length of time the child has been away from the biological parents – well, the child is away whenever they were going to do some tripping. In fact, it was such a big deal, she wrote it on her calendar. They spent more time it seems to me on their sex and drugs and writing down stuff and going to [the couple's therapist] than they did on this little guy, [the Child].

So I've considered that. I've also considered the age of the child when the care was assumed by the third party, which was from the time of birth, basically. At least after mom went back to work after the first year. The possible emotional effect on the child in a change of custody – the Court has considered that. The period of time which elapsed before the parents sought to reclaim the child – the Court has considered that. The nature and strength of the ties between the child and the third party custodian – the Court has considered that. And I find they're extremely strong with the grandparents.

The intensity and genuineness of the parents' desire to have the child – I don't find that there's intensity and genuineness on the part of [Petitioner]. I really don't. It's sad because she's the mother. The stability and certainty as the child's future in the custody of the parents. Well, I think it's clear. He would continue with instability and he would certainly fail. He'd be in crisis. He'd be out of that public school system probably for good.

Let's look to the grandparents. So I find the exceptional circumstances exist.

\* \* \*

Upon determining that exceptional circumstances existed in this case, the hearing judge next considered the fitness of the Grandparents to have custody. The hearing judge found that:

With the grandparents, there's total stability. They've proven it over their life and they've proven it with their testimony. I find them to be sincere, genuine, rock-solid people, the kind of people that you want raising children.

I think they were outstanding grandparents, but now they're going to be asked to actually serve as parents. But it won't be the first time. Because the parents have relied on them to do a lot of the parenting things throughout this little boy's life. A lot of financial things … And the parents were just content to let them do that. I don't see any real pride there. You'd think at some point you'd say, dad and mom, you've done enough. Or we need to do more.

You've got the grandfather – and I find the grandparents will give this little boy the guidance he needs which he's not getting from his mother. They'll give him the time that he needs. They have the time now. And he needs time. Not only does he need time, he needs quiet time, which he won't get with his mother. Anything but – it's chaotic, it's bizarre, I'm sure it's loud. And he's just – as I said, he just happens to be there along with everybody else.

His problems would be addressed with his grandparents, which are severe problems. And we've already addressed how they've manifested themselves to date.

They'll also have – the parents will not have to use before and after care. That's a significant part. The more time this child spends with parents or grandparents and the less time he spends with other people watching him, the better. You can have the best before and after care program in the United States. It's not the same as a mom or a dad or a grandparent who actually is really attached to the children. I don't see any evidence that mom is either able to or willing to completely change her schedule. She said she changed it last week. I asked her what she's going to do in the future. She doesn't know.

Now financially, she may not be able to do that. But that's still a factor. That's ten hours a day. The[n] you add the time that when she gets home, she's got to fix dinner – if there [is] such a thing as a sit down dinner at that house – and feed the dogs, clean up, and change her clothes – maybe do some things on her own. Those all take time away from this little boy. He's neglected. There's no doubt about it.

The grandparents have also added the religion to his life, which is not a must, but it's another piece of structure in his life which he likes. And they're raising him and he'll learn good values and good morals in a Christian church. I'm not saying it's a must. It's not a necessary. It's not a major factor.

35

But it shows another time that they spend with him and they do that with him every Sunday. And he likes it and I find that can only be helpful to him.

The [grand]parents don't smoke dope, the [grand]parents don't have all these crazy things. They have time for this little guy. They're well educated people. They know what it takes to be a productive, happy, respectful young man. They're dealing with some really bizarre things right now with this little boy acting up when he gets up. I suspect they know that there's probably more of that down the road. I think they have the wherewithal to deal with it, either professionally or with themselves. They know what values are. They know what morals are. They know what goals are. They know how important it is to sit down with him and not just say do homework, but to teach him about things. The grandfather has nice little things that he does with him. He likes to build things. The grandfather is a pretty talented guy with an engineering background. Those are all wonderful things for this little boy to learn.

The [grand]mother is a former math teacher – I thought the way she handled that situation with [the Child] was exactly how a mother should handle it or a well-intentioned and a hands-on grandmother. I think they will give him – they will have the patience and understanding to deal with him as opposed to bringing in two grandparents from Mississippi that never met him and say, well, they're the grandparents, they can take care of him. They know him better than the mother does. They know this little boy better than the father does. And they're honest. And they're willing to keep the parents in this little boy's life. They know it is important – at least until they prove that their parental rights should be terminated – and we're not there yet – and this case should have been a CINA case from the start. But unless their parental rights get terminated they'll keep the mom and dad in their lives and do the best they can.

They are, I find, very fit and proper people to have custody. We've got to look for purposes of the three judge panel, tick off some factors on [*Montgomery County Dep't of Soc. Servs. v. Sanders*, 38 Md. App. 406, 381 A.2d 1154 (1977)], but the fitness – certainly they're both very fit to have custody. Now, their age is up there. It is. But there's no indication that they have any illness and they don't have any illnesses to deal with.

One thing I was really impressed with, the [grand]mother said, we're caretakers, and they talked about the relative up in New Jersey, how they made that commitment every second week or third week of the month.

\*     \*     \*

36

What I'm saying is these people will do what it takes to do for this little boy. And if the little boy does fail, it won't be because he's with his grandparents.

The character reputation of the grandparents I think is top drawer. The desire of the grandparents to have custody is clearly there. I find that they really want to have custody by default because they know that's his only hope. The preference of the child – I don't consider that at age six. Opportunities for the future – he's got unlimited opportunities with his grandparents, financially, educationally, medically, emotionally – all of the things that a child needs to be successful, to be happy, to be healthy, to have friends – they'll make sure he gets on the right teams or clubs or activities. They'll find his interests. They'll expose him to a lot of different things that little boys need to be exposed to. And they'll make the right selection. They'll give him the right guidance. They'll do all the things that a good mom and good dad should do.

The age and health of the child – well, fortunately, he's not 16. He's not uncontrollable physically. He's still easy to manipulate and you can use a lot of psychological warfare on him, even though he's got some problems. He's still a little boy and you can trick him, which is a good thing.

They'll teach him respect for others, they'll teach him how to act at school and deal with other people, all the things that they know, because they know from experience. Unfortunately, the mother and father don't have that now. And it might be the drugs. Maybe they will. I think dad wants to. Who knows with mom, because she lied so much, who knows?

The residence of the [grand]parents – they've got a big house, nice house, more than [the Child] needs. I mean, a little boy, you can put him on the floor in the den. But he's got his own little room, he has his own little things. He can build things, he has a nice quiet place to do his homework. Where in the lord's name does he do his homework [at the marital home]? Is there any homework? I don't know. In the first grade, you don't get much, but you will later on, and there is some.

So under [*Sanders*] they fit all the categories. As I said, he's six. And maybe mom and dad later on will improve. Dad has made some great steps in it. And I keep coming back to – hey, [Petitioner's] kind of blasé about the whole situation. It's really interesting. And she turned on the very people that have been such a rock solid financial benefit and such a great resource for their son. I mean, they didn't ask for money. They did all of these things because they love their little grandson. And the thanks she gives them is well, I think,

37

you know, well they don't use the right car seat. I mean, come on. Let's find something we can attribute blame to,

So if she had custody – [Petitioner] – I think the grandparents would be out of the picture. There's no doubt about it. And I think there would be a fight over visitation with the father. And that would be one of the worst things that could happen to this little guy. He needs those people. Thank [G]od for grandparents in this case. And believe me, I lean heavily towards parents. I know the grandparents do, too. In the order of things, that's who should be raising these guys. But fortunately, you folks are there.

* * *

The hearing judge subsequently awarded physical custody of the Child to the Grandparents. The hearing judge granted visitation to Petitioner on every other weekend from Saturday at 9:00 a.m. to Sunday at 7:00 p.m., with no overnights, but every other Sunday of the visitation weekends, Petitioner's visitation hours were modified to 12:30 p.m. to 7:00 p.m. so the Child could continue to attend church services with his Grandparents. The hearing judge also stated he would not order drug counseling for either Father or Petitioner, finding that if the parties "want to keep smoking dope and taking hallucinatory drugs and having as many sex partners as you can – well, great. That's your life. But we're not going to let it impact on this little guy. If you want to break the law, you break the law."

On September 30, 2014, the hearing judge entered an interim order granting sole legal and physical custody of the Child to the Grandparents, with both parents retaining the right to visitation. The interim order also required Father to pay child support in the amount of $500 per month directly to the Grandparents, and stated a hearing would be set before a magistrate to determine Petitioner's child support obligations. On October 7, 2014, the Grandparents filed an Emergency Motion to Modify and Limit Petitioner's Access to the

38

Child, requesting the circuit court modify the Interim Order to grant the Grandparents discretion in determining the frequency and duration of Petitioner's access to the Child. The circuit court held an emergency hearing regarding the Grandparents' Motion on October 17, 2014, and on October 28, 2014 issued a Second Interim Order granting the Grandparents' Emergency Motion and modified Petitioner's rights to visitation.

On December 16, 2014, the circuit court entered a Final Order in the custody case that, *inter alia*, outlined the visitation schedule for the Child during holidays and summer break, and apportioned the payment owed to the BIA between Petitioner and Father. The Order also stated that "this Court has considered the issues adjudicated, the claims brought, the need to defend against those claims, and the financial status of the parties." Also on December 16, 2014, a notice was sent to the parties scheduling a hearing regarding child support for March 11, 2014.

## II. Child Support Proceedings

On December 30, 2014, the Grandparents filed a Motion for Child Support in the circuit court seeking child support from both Petitioner and Father to cover the care of the Child, including "extraordinary medical expenses" that ranged between $1,400 and $2,000 per month for the Child's psychiatric care. On February 26, 2015, Petitioner filed a Response in Opposition to the Grandparents' Motion for Child Support. A hearing was held on March 11, 2015, where a magistrate considered whether child support should be paid by Petitioner and Father to the Grandparents for the care of the Child.[35] On March

---

[35] Father filed an Answer to the Grandparents' Motion for Child Support on the morning of the hearing – March 11, 2015.

24, 2015, the magistrate issued his findings of fact and conclusions of law regarding child support. The magistrate acknowledged that an order titled "Final Order" had been entered by the trial court on December 16, 2014, but concluded that, because the order did not address child support, it could not be a final disposition of the case pursuant to both Maryland Rule 2-602[36] and our decision in *Rohrbeck v. Rohrbeck*, 318 Md. 28, 566 A.2d 767 (1989).[37]

---

[36] Maryland Rule 2-602 states:

(a) **Generally**. Except as provided in section (b) of this Rule, an order or other form of decision, however designated, that adjudicates fewer than all of the claims in an action (whether raised by original claim, counterclaim, cross-claim, or third-party claim), or that adjudicates less than an entire claim, or that adjudicates the rights and liabilities of fewer than all the parties to the action:
(1) is not a final judgment;
(2) does not terminate the action as to any of the claims or any of the parties; and
(3) is subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties.

(b) **When Allowed.** If the court expressly determines in a written order that there is no just reason for delay, it may direct in the order the entry of a final judgment:
(1) as to one or more but fewer than all of the claims or parties; or
(2) pursuant to [Maryland] Rule 2-501(f)(3), for some but less than all of the amount requested in a claim seeking money relief only.

[37] In *Rohrbeck*, we stated that for a ruling to "constitute a final judgment, it must contain the following three attributes: (1) it must be intended by the court as an unqualified final disposition of the matter in controversy[;] (2) unless the court properly acts pursuant to Maryland Rule 2-602(b)[,] it must adjudicate or complete the adjudication of all claims against all parties[;] and (3) the clerk must make a proper record of it in accordance with [Maryland] Rule 2-601." *Rohrbeck*, 318 Md. at 41, 566 A.2d at 773. The magistrate concluded that because the Final Order did not adjudicate the issue of child support between the parties it could not be considered a final judgment.

40

The magistrate also rendered the following findings of fact and conclusions of law in recommending that both Petitioner and Father pay child support to the Grandparents:

> So, now having decided that child support to be paid by [Petitioner and Father] were properly before me on March 11th, the questions to be answered are as follows. What is the appropriate amount of child support? Two, how is that amount of child support to be determined? And three, when do the child support payments begin? Now, with regard to determining what the appropriate amount of child support is, I first just want to note that under the law, and we all know this, each parent has a legal obligation to financially support their children. Section 5-203 of the Family Law Article specifically provides that the parents of a minor child are jointly and sever[ally] responsible for the child's support and care, nurture, welfare, and education. Then, in section 10-203 of the Family Law Article, it states a parent may not willfully fail to provide for the support of his or her minor child.
>
> And, these two statutory provisions that I've noted are supported by the Court of Appeals in the [*Drummond v. State to Use of Drummond*, 350 Md. 502, 714 A.2d 163 (1998)] case … [where] the Court of Appeals stated, the duty of parents to provide for the maintenance of their children is a principle of natural law, an obligation laid on them, not only by nature itself, but by their own proper act in bringing them into the world, by begetting them. Therefore, they have entered into a voluntary obligation to endeavor as far as in them lies that the life which they have bestowed shall be supported and preserved. So, there's no question that [Petitioner and Father] are obligated under the law to financially support [the Child].
>
> Now, with regard to the amount of child support, the question in my mind was how was child support to be determined when the child has been placed in the custody of a third party and not with one of the biological parents? First, I note that Family Law Article section 12-202, which all the attorneys are familiar with, which is the Maryland Child Support Guidelines, provides that quote in any proceeding to establish or modify child support, the court shall use the Child Support Guidelines. I could not find any case law, and none was presented to me, establishing whether the guidelines must be used in a case with facts such as the facts which are presented to me here. However, there is case law which established that when a child is placed in the custody of a government agency, the parents are still obligated to pay child support, and the amount to be paid is to be established using the Maryland Child Support Guidelines.

In a 1993 case, the Court of Special Appeals in [*In Re Joshua W.*, 94 Md. App. 486, 617 A.2d 1154 (1993)] noted that the General Assembly intended that the Child Support Guidelines be used in all child support cases, including those like the one in [*Joshua*] involving government-financed child care when the child has not been placed in the custody of either of the biological parents. The Court of Special Appeals in [*Joshua*] noted that the Child Support Guidelines were most often used when one biological parent or the other had physical custody. Dispute [sic] this emphasis on custodial and non-custodial parents, and sole and shared physical custody in the guidelines, there is nothing in the statute or its legislative history to suggest that the General Assembly intended that Child Support Guidelines only be applied to the usual child support cases. The Court of Special Appeals concluded that the guidelines were to be used in all cases when child support was at issue. And then, just recently, I guess nine years ago now, the Court of Special Appeals decision was followed by the Court of Appeals in [*In re Katherine C.*, 390 Md. 554, 890 A.2d 295 (2006)]. So, I'm required to use the guidelines.

The next question is when does the amount of child support begin for the parents? Now, with regard to modification cases, it's clear under Family Law Article 12-104,[38] and basically it states that it has been shown that there has been a modification of circumstances that are material. And then, the statute clearly states that the amount of the new child support can only begin from the date of filing. With regard to an initial filing or initial request for child support, as would be the case with regard to [Petitioner], the [Grandparents] argued that the court has the authority to make a child support award prior to the date of the first pleading. And again, the first pleading in this case seeking child support was December the 30th, 2014.

---

[38] Family Law Article §12-104 states:

**Modification of child support**

(a) The court may modify a child support award subsequent to the filing of a motion for modification and upon a showing of a material change of circumstance.

**Modification not retroactive**

(b) The court may not retroactively modify a child support award prior to the date of the filing of the motion for modification.

I was not able to find any case law or statutory authority to support the [Grandparents'] position with regard to starting child support prior to the date of the filing requesting the child support. I note that under [Family Law Article] section 12-101(a)(3), it states that for any other pleading that requests child support, the court may award child support for a period from the filing of the pleading that requests child support. I could not find any cases directly on point with this, but there is statements made in appellate decisions, such as in [*Krikstan v. Krikstan*, 90 Md. App. 462, 601 A.2d 1127 (1992)], says it is within the discretion of the chancellor to determine whether to make the award retroactive to the time of filing. And, I think that statement suggests that we are not to go prior to the date of the filing. And, I think the language in [Family Law §]12-101(a)(3) also supports that child support may be awarded from the filing of the pleading.

Then, there was an argument made by counsel that if it was determined that the guidelines would be the appropriate manner in which to determine the amount of child support to be paid by the parties, that I deviate from those guidelines. The attorneys know, this is well-stated or well-known, that the amount of child support called for under the guidelines is presumed to be correct. The presumption can be rebutted by evidence that the application of the guidelines would be unjust or inappropriate in a particular case. And then, if I am to deviate from the guidelines, I have to state what the amount called for under the guidelines would be, and then also how the deviation benefits the children.

So, those are the conclusions of law that I'm finding in this case.

\* \* \*

The magistrate then assessed Petitioner's and Father's income and determined Petitioner's annual income from her employment at Direct Energy was $37,605.24 and her actual monthly income was $3,134. The magistrate determined that Father was unemployed, having previously worked at Geotech until he was laid off, and he received $1,820 per month in unemployment benefits. The magistrate took judicial notice that Father was under a separate child support order in the amount of $475 per month for another child. The magistrate also acknowledged that the Child had been under the care of

43

both a psychiatrist and psychologist since 2014, and had been diagnosed with Attention

Deficit Hyperactivity Disorder ("ADHD"),[39] an anxiety disorder, and operational defiant

disorder ("ODD").[40]  The magistrate concluded – based on the psychiatrist's testimony at

---

[39]  The DSM-V states that the essential feature of ADHD is "a persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development."  Am. Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th Edition 2013), https://perma.cc/J2MF-T7CC (last accessed: June 30, 2017). The DSM-V explains that:

> *Inattention* manifests behaviorally in ADHD as wandering off task, lacking persistence, having difficulty sustaining focus, and being disorganized and is not due to defiance or lack of comprehension. *Hyperactivity* refers to excessive motor activity (such as a child running about) when it is not appropriate, or excessive fidgeting, tapping, or talkativeness …. *Impulsivity* refers to hasty actions that occur in the moment without forethought and that have high potential for harm to the individual (e.g., darting into the street without looking). Impulsivity may reflect a desire for immediate rewards or an inability to delay gratification. Impulsive behaviors may manifest as social intrusiveness (e.g., interrupting others excessively) and/or as making important decisions without consideration of long-term consequences (e.g., taking a job without adequate information).
>
> *      *      *

*Id.*

[40] The DSM-V states that the essential feature of ODD is "a frequent and persistent pattern of angry/irritable mood, argumentative/defiant behavior, or vindictiveness[.]" Am. Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th Edition 2013), https://perma.cc/HET6-RJ57 (last accessed: June 30, 2017).  The DSM-V also states that:

> The symptoms of [ODD] may be confined to only one setting, and this is most frequently the home. Individuals who show enough symptoms to meet the diagnostic threshold, even if it is only at home, may be significantly impaired in their social functioning. However, in more severe cases, the symptoms of the disorder are present in multiple settings. Given that the pervasiveness of symptoms is an indicator of the severity of the disorder, it is critical that the individual's behavior be assessed across multiple settings and relationships.

(continued . . .)

the March 11 hearing – that the Child would need long-term psychiatric and psychotherapeutic care. The magistrate acknowledged that the Child was covered, at no additional cost, under the Grandparents family health insurance plan, but that the Grandparents paid out-of-pocket for the Child to see both the psychiatrist and psychologist outside of the Grandparents' insurance plan in the amount of $1,312.50 per month.

Based on these factual findings, the magistrate concluded that:

I believe that the Maryland Guidelines are required to be used in this case. I believe that the child support to be ordered can only be from the date of filing for the child support by the [Grandparents] on December the 30th, 2014, with regard to the amount to be paid by [Petitioner] and with regard to the modification of the amount previously ordered to be paid by [Father]. Using the guidelines and the facts that I found based upon the evidence, the amount

_____

(. . . continued)

\* \* \*

There are several key considerations for determining if the behaviors are symptomatic of [ODD]. First, the diagnostic threshold of four or more symptoms within the preceding 6 months must be met. Second, the persistence and frequency of the symptoms should exceed what is normative for an individual's age, gender, and culture. For example, it is not unusual for preschool children to show temper tantrums on a weekly basis. Temper outbursts for a preschool child would be considered a symptom of [ODD] only if they occurred on most days for the preceding 6 months, if they occurred with at least three other symptoms of the disorder, and if the temper outbursts contributed to the significant impairment associated with the disorder (e.g., led to destruction of property during outbursts, resulted in the child being asked to leave a preschool).

The symptoms of the disorder often are part of a pattern of problematic interactions with others. Furthermore, individuals with this disorder typically do not regard themselves as angry, oppositional, or defiant. Instead, they often justify their behavior as a response to unreasonable demands or circumstances. Thus, it can be difficult to disentangle the relative contribution of the individual with the disorder to the problematic interactions he or she experiences.

\* \* \*

*Id.*

45

of child support called for under the guidelines would be $1,467 per month by [Petitioner], and $629 per month by [Father]. I'm handing out now to the attorneys the child support worksheet which I used.

Now, I considered a deviation from the guidelines. The only evidence that the guidelines amount would be unjust or inappropriate is that the guidelines call for a significant amount from both [Petitioner's] monthly adjusted actual income and [Father's] monthly adjusted actual income. The amount called for under the guidelines would be 47 percent of [Petitioner and Father's] monthly adjusted income, and that is significant. But I note that to deviate from the guidelines would mean that the cost for providing for [the Child] would fall to the [Grandparents] who have no legal obligation to financially support [the Child], and I will not do this.

* * *

The magistrate subsequently entered his recommendation that Petitioner be obligated to pay child support to the Grandparents in the amount of $1,467 per month, with arrearages in the amount of $4,401. The magistrate recommended the arrearages be repaid at a rate of $25 per month until paid in full. In regard to Father, the magistrate recommended that the interim order be modified to reflect that Father pay child support to the Grandparents in the amount of $629 per month, with arrearages in the amount of $3,387. Similarly as to Petitioner, the magistrate recommended the arrearages be repaid at a rate of $25 per month until repaid in full. The magistrate also recommended that Father provide the Grandparents with information about his attempts to locate full-time employment every 60 days, commencing on the 60th day from the entry of the magistrate's order until he finds full-time employment.

On April 4, 2015, Petitioner filed Exceptions to the Magistrate's Recommendations Concerning Findings of Fact and Conclusions of Law challenging: (1) the magistrate's finding that the Final Order entered on December 16, 2014 was not a final judgment and

46

considering the merits of the Grandparents' Motion for Child Support; (2) the magistrate's finding of "extraordinary medical expenses" in light of the fact the Grandparents had an insurance plan that covered the psychological and psychiatric care for the Child and no explanation was provided for why the Child was seeing a psychiatrist and psychologist that were not covered under the Grandparents insurance plan; (3) the magistrate's determination that the Grandparents were similarly situated to a guardian appointed by a government agency and that they were under no legal obligation to support the Child; and (4) the magistrate's determination that Petitioner should pay $1,467 per month or 47 percent of her monthly income in excess of federal and state mandates. On May 26, 2015, the circuit court denied Petitioner's Exceptions and granted the Grandparents' Motion for Child Support in accordance with the magistrate's recommendations.

On June 19, 2015, Petitioner filed a timely Notice of Appeal to the Court of Special Appeals. On December 7, 2016, in a reported opinion, the Court of Special Appeals held, *inter alia*, that: (1) the circuit court did not abuse its discretion when it granted the Grandparents' motion for permissive intervention; (2) the circuit court did not abuse its discretion in finding Petitioner was unfit; (3) the circuit court did not abuse its discretion when it found that exceptional circumstances existed in the case at bar; and (4) the circuit court did not abuse its discretion in awarding child support to the Grandparents.[41] *See Burak v. Burak, et al.*, 231 Md. App. 242, 150 A.3d 360 (2016).

_____

[41] The Court of Special Appeals also considered the following issues in its opinion: (1) whether the circuit court abused its discretion by soliciting expert testimony during a hearing in an "unorthodox manner;" (2) whether the circuit court erred in permitting the

(continued . . . )

On March 3, 2017, we granted Petitioner's petition for writ of *certiorari* to address

the following questions:

(1) May grandparents intervene in a custody dispute between parents to seek custody of their grandchild before there has been an adjudication of the unfitness of the custodial parents?

(2) May the "exceptional circumstances" test set forth by this Court in *Ross v. Hoffman*, 280 Md. 172, [372 A.2d 582] (1977), be used to take custody away from a biological parent with whom the child has lived for his entire life?

(3) May a parent be required to pay child support to grandparents and, if so, may child support be awarded without consideration of the financial resources of the grandparents?

**STANDARD OF REVIEW**

We have held that, regardless of whether a party seeks to intervene as of right or

permissively, the decision to allow a party to intervene "is dependent upon the individual

circumstances of each case and rests in the sound discretion of the trial court, which, unless

abused, will not be disturbed on appellate review." *Md. Radiological Soc., Inc. v. Health

Services Cost Review Comm'n*, 285 Md 383, 388, 402 A.2d 907, 910 (1979) (quoting

*NAACP v. New York*, 413 U.S. 345, 365-66, 93 S. Ct. 2591, [2606-03] (1973)).

In *In re Yve S.*, 373 Md. 551, 819 A.2d 1030 (2003), we established that there are

three distinct aspects to our review in child custody disputes. We held that

When the appellate court scrutinizes factual findings, the clearly erroneous standard of [Maryland Rule 8-131(a)] applies. [Second], if it appears that the

---

(. . . continued)

Grandparents to intervene in the parties' divorce property distribution hearing; and (3) whether the circuit court erred in awarding Father with "contributions made towards maintenance of the family home." Because those issues were not raised on appeal before this Court we do not address the lower Court's holdings regarding those issues.

[hearing court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [hearing court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [hearing court's] decision should be disturbed only if there has been a clear abuse of discretion.

*Id.* at 586, 819 A.2d at 1051 (citations omitted). We also concluded that

[I]t is within the sound discretion of the [hearing court] to award custody according to the exigencies of each case, and as our decisions indicate, a reviewing court may interfere with such a determination only on a clear showing of abuse of that discretion. Such broad discretion is vested in the [hearing court] because only he [or she] sees the witnesses and the parties, hears the testimony, and has the opportunity to speak with the child; he [or she] is in a far better position than is an appellate court, which has only a cold record before it, to weigh the evidence and determine what disposition will best promote the welfare of the minor.

*Id.* at 585-86, 819 A.2d at 1051 (citations omitted).

## DISCUSSION

### I. Grandparents' Intervention

Petitioner argues that her fundamental constitutional rights were violated when the circuit court allowed the Grandparents to intervene in the custody dispute between her and Father, prior to a finding of either parental unfitness or the existence of exceptional circumstances. Petitioner notes that in *McDermott v. Dougherty*, 385 Md. 320, 869 A.2d 751 (2005), we held that, in third-party custody disputes, the circuit court "must first find that both natural parents are unfit to have custody of their children or that extraordinary circumstances exist which are significantly detrimental to the child" before the circuit court may consider the best interests of the child standard. *See id.*, at 325, 869 A.2d at 754. Petitioner contends, however, that we did not address the question of whether the required

preliminary finding of parental unfitness should occur in a separate proceeding or hearing and did not consider the rule in the context of third-party intervention in parental custody disputes. In Petitioner's view, allowing third-parties to intervene in a parental custody dispute without a prior finding of parental unfitness or extraordinary circumstances violates the fundamental liberty interest of parents in raising their children without the interference of the State. Petitioner contends that in the case at bar, the Grandparents were permitted to intervene in the custody action on the basis of a general allegation of extraordinary circumstances and by suggesting in their motion for intervention that they were concerned about the fitness of the parents.

Petitioner notes that in *Blixt v. Blixt*, 774 N.E.2d 1052 (Mass. 2002), a Massachusetts case addressing grandparent visitation, the Supreme Judicial Court of Massachusetts required that petitions filed by grandparents seeking visitation with their grandchild were required to be pled with specificity and verified in order to safeguard the parents' constitutional right to be free from interference in their parental decisions. *See id.* at 1066. Petitioner contends that depriving a parent of custody is a far greater impingement on parental rights, and yet, the circuit court in this case allowed the Grandparents to intervene in the custody action without requiring any specific allegations that supporting the claim that Petitioner was an unfit parent.

Petitioner avers that if third-parties are permitted to intervene in custody disputes between parents prior to a finding that both parents are unfit then: (1) there is an increased likelihood that the third-party will become a proxy for one of the parents in the custody dispute; (2) the third-party's claims will add to the already considerable cost and strain of

50

custody litigation; and (3) there will be an increased likelihood of bias and unfairness in determining the outcome of the custody dispute.

Petitioner contends that allowing third-party intervention into custody disputes encourages third-parties to serve as proxies, especially in circumstances where it becomes evident that one of the parents will not be granted custody, which Petitioner avers occurred here. Petitioner argues that allowing this type of proxy role in custody disputes may: (1) cause harm to parent-child relationships; (2) violate the constitutional rights of the parents; and (3) cause an increase in frequency, cost, and stress of custody litigation – which itself constitutes an unconstitutional burden on a parent's fundamental right to raise their children. *See McDermott*, 385 Md. at 422, 869 A.2d at 811 (citing *Parham v. J.R.*, 442 U.S. 584, 602, 99 S. Ct. 2493, 2504 (1979)); *see also Major v. Maguire*, 128 A.3d 675, 687 (N.J. 2016) (concluding in a grandparent visitation case that "[b]y virtue of its capacity to intrude upon the privacy of both parent and child and consume scarce resources, the parties' litigation may itself infringe on the parent's due process right to autonomy, and cause harm to the child[.]"); *Glidden v. Conley*, 820 A.2d 197, 206 (Vt. 2003) (recognizing that a parent's constitutional right to raise a child can be implicated by burden of litigation domestic relations proceedings).

Petitioner also argues that allowing third-parties to intervene prior to a finding of unfitness facilitates biased and unfair findings based on subjective considerations made by the hearing judge. Petitioner notes that in *McDermott* we cited approvingly a New Jersey Supreme Court case, *Watkins v. Nelson*, 748 A.2d 558 (N.J. 2000), where the New Jersey court expressly declined to adopt a test that would assess whether "the child's growth and

development would be 'detrimentally affected' by placement with a parent." *See McDermott*, 385 Md. at 375-81, 869 A.2d at 783-87 (quoting *Watkins*, 748 A.2d at 565-68). Among the flaws the *Watkins* Court found in such an approach, was that "[t]he use of such a standard to decide custody disputes between a fit parent and a third party will evolve into a 'fitness contest' whose outcome will depend on the whims of the trial court." *Id.* at 380, 869 A.2d at 786 (quoting *Watkins*, 748 A.2d at 568). Petitioner also notes that the *Watkins* Court expressed concern that without sufficient protection of parental rights, "a judge may take children from their parents because the judge personally [disapproves of] the parents." *Id.* at 379, 869 A.2d at 786 (quoting *Watkins*, 748 A.2d at 567). In adopting the rule that a third-party must first rebut the presumption favoring parental custody by "proof of gross misconduct, abandonment, unfitness or the existence of 'exceptional circumstances,'" the *Watkins* court concluded that it wanted to "minimize judicial opportunity to engage in social engineering in custody cases involving third parties." *Watkins*, 748 A.2d at 559, 567.

In contrast to Petitioner's arguments, the Grandparents aver there was no procedural bar to their filing a motion to intervene in the custody action, because Maryland Rule 2-214 allows a person to intervene in an action "when the person's claim or defense has a question of law or fact in common with the action." Maryland Rule 2-214(b)(1). The Grandparents acknowledge that Maryland Rule 2-214 also requires the court to consider "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties" and that there are certain procedural requirements the person seeking to intervene must follow, but argue that they complied with the procedural requirements

52

and Petitioner was not unduly prejudiced. *See* Maryland Rule 2-214(b)(3), (c).[42] The Grandparents aver that Petitioner's main argument is that we should read a preliminary step into Maryland Rule 2-214 that would require an initial judicial determination of unfitness or exceptional circumstances before a third-party would be permitted to intervene. The Grandparents note, however, that the underlying purpose of Maryland Rule 2-214 "is to promote judicial economy in litigation." *See* Md. Rules Commentary, Rule 2-214 at 199. The Grandparents contend, therefore, that requiring the initial step that Petitioner seeks would be in contravention of the purpose of the permissive intervention rule.

The Grandparents argue that the main flaw in Petitioner's argument is her misreading of the plain language in *McDermott*. They contend that *McDermott* did not contemplate a separate or bifurcated proceeding to determine whether a parent is fit or that exceptional circumstances exist. Rather, the Grandparents argue that the "first" language in *McDermott* is intended to instruct hearing courts that, prior to evaluating the best interests of the child, it must first determine that the third-party has been elevated to the same constitutional level as the parent. *See In re Rashawn H.*, 402 Md. 477, 495, 937 A.2d

---

[42] Maryland Rule 2-214(c) states that:

> (c) **Procedure.** A person desiring to intervene shall file and serve a motion to intervene. The motion shall state the grounds therefor and shall be accompanied by a copy of the proposed pleading, motion, or response setting forth the claim or defense for which intervention is sought. An order granting intervention shall designate the intervenor as a plaintiff or defendant. Thereupon, the intervenor shall promptly file the pleading, motion, or response and serve it upon all parties.

177, 188 (2007). The Grandparents also argue that bifurcating the preliminary inquiry from the best interest analysis would be difficult because many of the facts that establish the initial inquiries would necessarily be used to address the best interest of the child analysis. The Grandparents contend that Petitioner's argument favoring a preliminary proceeding also has a logical flaw because if the court was to determine in the initial proceeding that both parents were unfit, the court would have no ability to act immediately to protect the minor child.

The Grandparents also aver that Maryland has a well-established history of permitting third-parties to participate in custody litigation. *See De Angelis v. Kelley*, 184 Md. 183, 40 A.2d 332 (1944) (acknowledging that a third-party has a right to participate in custody litigation); *Ross v. Pick*, 199 Md. 341, 86 A.2d 463 (1952) ("*Pick*") (holding that there is a *prima facie* presumption that a child should be in the care and custody of parents, and the burden is on the third-party to overcome the presumption). The Grandparents note that in *Ross v. Hoffman*, 280 Md. 172, 372 A.2d 582 (1977) ("*Hoffman*"), we concluded that

> [w]hen the dispute is between a biological parent and a third party, it is presumed that the child's best interest is subserved by custody in the parent. That presumption is overcome and such custody will be denied if (a) the parent is unfit to have custody, or (b) if there are such exceptional circumstances as make such custody detrimental to the best interest of the child. Therefore, in parent-third party disputes over custody, it is only upon a determination by the equity court that the parent is unfit or that there are exceptional circumstances which make custody in the parent detrimental to the best interest of the child, that the court need inquire into the best interest of the child in order to make a proper custodial disposition.

*Id.* at 178-79, 372 A.2d at 587; *see also McDermott*, 385 Md. at 374, 869 A.2d at 783. The Grandparents contend that these cases establish that they had the ability to initiate their own custody case naming Petitioner and Father as defendants and that, had they done so, the case would have likely been consolidated with the pending custody action between Petitioner and Father, pursuant to Maryland Rule 2-503.[43]

We hold that there is no procedural bar preventing a third-party from seeking to permissively intervene[44] in an existent custody action as long as he or she can make a *prima*

---

[43] Maryland Rule 2-503 states, in relevant part:

**(a) Consolidation.**
   (1) *When Permitted*. When actions involve a common question of law or fact or a common subject matter, the court, on motion or on its own initiative, may order a joint hearing or trial or consolidation of any or all of the claims, issues, or actions. An action instituted in the District Court may be consolidated with an action pending in a circuit court under the circumstances described in [Courts & Judicial Proceedings] Article §6-104(b). The court may enter any order regulating the proceeding, including the filing and serving of papers, that will tend to avoid unnecessary costs or delay.

   (2) *Verdict or Judgment*. In the trial of a consolidated action, the court may direct that joint or separate verdicts or judgments be entered.

**(b) Separate Trials.** In furtherance of convenience or to avoid prejudice, the court, on motion or on its own initiative, may order a separate trial of any claim, counterclaim, cross-claim, or third-party claim, or of any separate issue, or of any number of claims, counterclaims, cross-claims, third-party claims, or issues.

The Grandparents note that both matters would have raised common questions of fact and law because both dealt in the same subject matter – the custody of the Child.

[44] Grandparents and other third-parties seeking to intervene in a custody action between a child's biological parents do not have the right to intervene in the custody action

(continued . . .)

55

*facie* showing that the parents are either unfit or that exceptional circumstances exist and

that the child's best interests would be served in the custody of the third-party.[45]

---

(. . . continued)
As a matter of right. As we stated in *McDermott*,

> Where the [custody] dispute is between a fit parent and a private third party,
> however, both parties do not begin on equal footing in respect to rights to
> "care, custody, and control" of the children. The parent is asserting a
> fundamental constitutional right. The third party is not. *A private third party
> has no fundamental constitutional right to raise the children of others*.
> Generally, absent a constitutional statute, the non-governmental third party
> has no rights, constitutional or otherwise, to raise someone else's child.

*McDermott*, 385 Md. at 353, 869 A.2d at 770 (emphasis added). Thus, a third-party does
not have "an unconditional right to intervene as a matter of law" in a custody dispute
between a child's parents, and may only do so if they satisfy the pleading requirements for
permissive intervention as modified by this opinion. *See* Maryland Rule 2-214.

[45] In *Koshko v. Haining*, 398 Md. 404, 921 A.2d 171 (2007), a case addressing
grandparents' right to visitation, we concluded that

> if third parties wish to disturb the judgment of a parent, those third parties
> must come before our courts possessed of at least *prima facie* evidence that
> the parents are either unfit or that there are exceptional circumstances
> warranting the relief sought before the best interests standard is engaged.

*Id.* at 440, 921 A.2d at 192. We also explained in a footnote that

> [a]t any evidentiary hearing on a petition, the petitioners must produce
> evidence to establish their *prima facie* case on the issue of either parental
> unfitness or exceptional circumstances as well as evidence sufficient to tip
> the scales of the best interests balancing test in their favor. We appreciate
> that there may be circumstances where evidence proffered for the satisfaction
> of a threshold element also may have relevance in the determination of the
> best interest standard. We do not intend to foster a "trial within a trial." At
> the end of the day, petitioners, in order to be successful, must shoulder the
> burdens to adduce at least a *prima facie* case on both the
> unfitness/exceptional circumstances standard and the best interests standard.
>                                                          (continued . . .)

56

Specifically, a third-party seeking to intervene in a custody dispute must include detailed factual allegations in his or her pleading that, if true, would support a finding that both biological parents are either unfit or that exceptional circumstances exist and that the best interests of the child would be served in the custody of the third-party. *See* Maryland Rule 2-214(c) (requiring a party seeking to intervene in a cause of action to "state the grounds" upon which they are seeking to intervene). We note that, in third-party custody disputes, a third-party can only prevail in obtaining custody of a child if he or she overcomes the presumption that the child's best interest is served by being placed in the custody of the parent, by showing that the parents are either unfit or there are exceptional circumstances that would make custody with the parent detrimental to the best interests of the child. *See McDermott*, 385 Md. at 374, 869 A.2d at 783; *Hoffman*, 280 Md. at 178-79, 372 A.2d at 587. The parties acknowledge the presumption favoring parental custody exists because "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 2060 (2000); *see also McDermott*, 385 Md. at 326, 869 A.2d at 754 (concluding that *Troxel*'s plurality holding that parents

---

(. . . continued)

*Id.* at 445 n. 23, 921 A.2d at 195 n. 23. We also acknowledged "that the standards and processes relevant to all manner of custody and visitation determinations are nearly identical." *Id.* at 442-43, 921 A.2d at 194. Quoting our decision in *Boswell v. Boswell*, 352 Md. 204, 721 A.2d 662 (1998), we also recognized that "'the case law discussed in this opinion concerning custody determinations, and the principles governing such situations, are equally applicable to visitation proceedings.'" *Id.* (quoting *Boswell*, 352 Md. at 236, 721 A.2d at 677). Thus, our own precedent provides support for adopting this initial pleading requirement in custody actions where a third-party seeks to intervene

have a fundamental right to make decisions regarding their children is "instructive") (citation omitted).

Accordingly, we hold that for a third-party to have standing to intervene in a custody action, he or she must plead sufficient facts that, if true, would support a finding of either parental unfitness or the existence of exceptional circumstances and demonstrates that the best interests of the child would be served in the custody of the third-party. We conclude this additional pleading requirement is necessary to balance the constitutional right a parent has over the care and custody of their children with the reality that circumstances exist where the presumption favoring parents is overcome and the child's best interests are served in the custody of third-parties. This additional pleading requirement will also aid the circuit court in determining whether intervention would "unduly delay or prejudice the adjudication of the rights of the original parties[]" because the hearing judge will be required to determine, prior to the third-party's intervention, whether the proposed intervenor has alleged sufficient facts in its pleading that, if true, would overcome the constitutional presumption favoring parental custody. *See* Maryland Rule 2-214(b)(3).

We also conclude that a preliminary hearing is not the appropriate forum for a court to make an ultimate determination as to whether a parent is unfit or that exceptional circumstances exist in a third-party custody dispute. *McDermott* states that "the trial court must first find" that the parents are either unfit or that extraordinary circumstances exist "before a trial court should consider" the best interests of the child standard. *McDermott*, 385 Md. at 374-75, 869 A.2d at 783. By referencing the court charged with making the fitness or exceptional circumstances determination as the "trial court[,]" *McDermott*

58

indicates that the assessment should occur at the custody merits hearing, not in a preliminary proceeding. Additionally, as the Grandparents argue, having a preliminary proceeding in advance of the custody merits hearing would likely result in redundancy in the proceedings because facts presented at the preliminary hearing regarding parental fitness or exceptional circumstances may well be relevant to the court's determination at the custody hearing regarding the best interests of the child. Accordingly, we conclude that, in third-party custody disputes, the circuit court is not required to hold a preliminary or separate proceeding to determine whether a parent is fit or whether exceptional circumstances exist prior to the custody merits hearing. The hearing judge may assess the parents' fitness and determine whether exceptional circumstances exist at the custody merits hearing as long as he or she makes that determination prior to assessing the best interest of the child.

In the case at bar, Petitioner argues that the Grandparents' motion for permissive intervention was insufficient because it contained only a general allegation of extraordinary circumstances and expressed their concern regarding the fitness of the parents. We disagree. We note Maryland Rule 2-214(c) requires the Grandparents to attach their proposed Complaint for Custody to their Motion for Permissive Intervention. As noted, *supra*, in their proposed Complaint, the Grandparents alleged that: (1) although the Child resided with Petitioner, the Grandparents "have acted *in loco parentis*" with the Child since birth; (2) the Child has spent significant periods of time with the Grandparents – up to five overnights per week; (3) the Grandparents have actively participated in the Child's schooling, paid for the Child's child care, organized activities and play dates for the Child,

and helped take the Child to doctor's appointments; (4) the Grandparents became increasingly aware of Petitioner and Father's abuse of drugs while the Child was in their care; (5) Petitioner informed the Custody Evaluator that she was not using drugs, but then subsequently tested positive for marijuana in a mandatory drug test; (6) evidence indicated Petitioner lied about being coerced into using drugs by Father – as evidenced by her positive drug test post-separation; and (7) the circuit court *sua sponte* required both parents to submit to psychiatric evaluations.  We conclude these allegations are sufficient to make a *prima facie* showing that either Father or Petitioner or both were unfit and that there may have been exceptional circumstances that existed in this case.  Accordingly, we hold the circuit court did not err in allowing the Grandparents to intervene in the custody dispute between Petitioner and Father.

## II.    Unfitness

### a.  Appealability

We note that Petitioner did not independently appeal the unfitness issue decided by the Court of Special Appeals to this Court, but rather, incorporated the argument into her argument regarding permissive intervention.  *See supra*.  We also note that the Grandparents did not address the circuit court's unfitness finding in their brief.  The brief exclusively addressed Petitioner's argument regarding the circuit court's grant of their motion to intervene in the custody action.  The unfitness issue was, however, raised and argued before the Court of Special Appeals, which concluded that the circuit court did not err in finding Petitioner to be an unfit parent, and Petitioner raised the issue in her petition for a writ of *certiorari,* albeit, again, it was incorporated into her intervention argument.

60

We also note that both sides argued the issue extensively before us at oral argument on June 2, 2017. We conclude that the issue of Petitioner's fitness as a parent was, therefore, sufficiently preserved for our review. *See* Maryland Rule 8-131.[46]

### b. The Circuit Court's Finding That Petitioner Was Unfit

---

[46] Maryland Rule 8-131 states, in relevant part, that

(a) **Generally.** The issues of jurisdiction of the trial court over the subject matter and, unless waived under [Maryland] Rule 2-322, over a person may be raised in and decided by the appellate court whether or not raised in and decided by the trial court. Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.

(b) **In Court of Appeals – Additional Limitations.**

    (1) *Prior Appellate Decision*. Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Court of Special Appeals … the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals. Whenever an issue raised in a petition for certiorari or a cross-petition involves, either expressly or implicitly, the assertion that the trial court committed error, the Court of Appeals may consider whether the error was harmless or non-prejudicial even though the matter of harm or prejudice was not raised in the petition or in a cross-petition.

*   *   *

*Cf. State v. Parker*, 334 Md. 576, 596-97, 640 A.2d 1104, 1114 (1994) (concluding that the use of the term "ordinarily" in Maryland Rule 8-131(b) "implies that this Court possesses the discretion to consider issues that were not necessarily raised in the petition or order for a [w]rit of [c]ertiorari.") (citing *State v. Bell*, 334 Md. 178, 188, 638 A.2d 107, 113 (1994)), *with*, *Holbrook v. State*, 364 Md. 354, 375, 772 A.2d 1240, 1252 (2001) (declining to consider petitioner's claim that reckless endangerment convictions should merge with an arson conviction as a matter of "fundamental fairness" when the argument was neither raised in petitioner's petition for writ of *certiorari* nor was it argued before the Court of Special Appeals).

Petitioner argues that much of the evidence the hearing judge relied on in finding her unfit came from Father and M, prejudicial witnesses, who testified about events that occurred several years prior to the parties' separation and the custody hearing. Petitioner also contends that the hearing judge failed to explain why, if Petitioner was such an unfit parent, the Child was described at the hearing as a bright, well-adjusted student throughout kindergarten, prior to the Grandparents' intervention. Petitioner acknowledges that she tested positive for marijuana in one of her drug tests, but contends the hearing court did not allow her to challenge the accuracy of the result and that, even if she had smoked marijuana, the General Assembly has decriminalized it. *See* Criminal Law Article §5-601. Petitioner also concedes that the Child began exhibiting behavioral problems at the end of his kindergarten year, but notes that there was no evidence or expert testimony presented at the custody hearing regarding the cause of the Child's behavioral difficulties. Petitioner also avers that, in considering the Crisis Center incident, the hearing judge ignored the testimony from the school principal and guidance counselor stating that Petitioner responded promptly to their request to discuss the incident and that she was generally a responsible and responsive parent. Petitioner contends the hearing judge also made unsupported conclusions about her emotional attachment to the Child, including his finding that:

> I didn't hear how she said, you know, I just love to put him to bed at night. I like to tuck him in. I like to read him a story. We take little walks together. I like to go through colors with him and numbers with him. He loves to wear this particular sweatshirt. You didn't hear any of that. I didn't see any really love or total attachment. I mean, this is her flesh and blood, her own son. Most mothers would give up their lives for their children in a tragedy. A child fell into a river, they'd dive in. I think in this case, I don't know what she'd

do. She might leisurely walk over and make a call. I don't know. But what I've seen from the time the child was born, she's not even acting the way a babysitter would act. Because if she were the babysitter and she went to school on the fourth and the teacher told her what happened or daycare provider, she'd be calling everybody she possibly could. She'd be calling the mother, she'd be calling the father, she'd be calling the grandparents. Did you hear – let me tell you what the principal said.

Petitioner also notes that the hearing judge stated that he found Petitioner "to be a very dishonest witness, and I'll tell her. She may be a good mother and a lot of good qualities. They didn't all come out." In Petitioner's view, the hearing judge's concession that "[s]he may be a good mother" should have ended the inquiry regarding her fitness as a parent. Petitioner argues that it is precisely this type of subjective assessment – or judicial "social engineering" – that the *Watkins* Court, *see supra*, was concerned about in refusing to adopt the "detrimentally affected" test. Petitioner contends that this case demonstrates why a court's finding of parental unfitness should be based on objective, rather than subjective, criteria – such as the specific criteria contained in the Termination of Parental Rights statute. *See* Family Law Article ("Fam. Law") §5-323(d).[47]

---

[47] Fam. Law §5-323(d) states:

Except as provided in subsection (c) of this section, in ruling on a petition for guardianship of a child, a juvenile court shall give primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests, including:

(1) (i) all services offered to the parent before the child's placement, whether offered by a local department, another agency, or a professional;
 (ii) the extent, nature, and timeliness of services offered by a local department to facilitate reunion of the child and parent; and
 (iii) the extent to which a local department and parent have fulfilled their

(continued . . .)

obligations under a social services agreement, if any;

(2) the results of the parent's effort to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home, including:

(i) the extent to which the parent has maintained regular contact with:

1. the child;
2. the local department to which the child is committed; and
3. if feasible, the child's caregiver;

(ii) the parent's contribution to a reasonable part of the child's care and support, if the parent is financially able to do so;

(iii) the existence of a parental disability that makes the parent consistently unable to care for the child's immediate and ongoing physical or psychological needs for long periods of time; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the parent within an ascertainable time not to exceed 18 months from the date of placement unless the juvenile court makes a specific finding that it is in the child's best interests to extend the time for a specified period;

(3) whether:

(i) the parent has abused or neglected the child or a minor and the seriousness of the abuse or neglect;

(ii) 1. A. on admission to a hospital for the child's delivery, the mother tested positive for a drug as evidenced by a positive toxicology test' or

B. upon the birth of the child, the child tested positive for a drug as evidenced by a positive toxicology test; and

2. the mother refused the level of drug treatment recommended by a qualified addictions specialist, as defined in §5-1201 of this title, or by a physician or psychologist, as defined in the Health Occupations Article;

(iii) the parent subjected the child to:

1. chronic abuse;
2. chronic and life-threatening neglect;
3. sexual abuse; or
4. torture;

(iv) the parent has been convicted, in any state or any court of the United States, of:

1. a crime of violence against:
   A. a minor offspring of the parent;
   B. the child; or

(continued . . .)

We note that determining whether a circuit court erred in finding a biological parent "unfit" in a third-party custody dispute is an issue of first impression for this Court. Considering the issue necessarily requires a nuanced understanding of precisely what the term "unfit" means within the context of Maryland family law. We observe, however, that our precedent provides no such clear definition. The only decision from this Court that provides any definition for the word "unfit" in the custody context is *In re Rashawn H.*, 402 Md. 477, 937 A.2d 177 (2007), a termination of parental rights ("TPR") case that states "[i]n a custody case, unfitness means an unfitness to have *custody* of the child, not an unfitness to remain the child's parent[.]" *Id.* at 498, 937 A.2d at 190 (emphasis in original). The *Rashawn* Court's definition clarifies that an "unfitness" determination in a custody dispute is distinct from an "unfitness" finding in the TPR context, but does not provide a clear definition of "unfitness" for our purposes. While Petitioner argues that we should,

---

(. . . continued)
     C. another parent of the child; or
    2. aiding or abetting, conspiring, or soliciting to commit a crime described in item 1 of this item; and
   (v) the parent has involuntarily lost parental rights to a sibling of the child; and
  (4) (i) the child's emotional ties with and feelings towards the child's parents, the child's siblings, and others who may affect the child's best interests significantly;
   (ii) the child's adjustment to:
    1. community;
    2. home;
    3. placement; and
    4. school;
   (iii) the child's feelings about severance of the parent-child relationship; and
   (iv) the likely impact of terminating parental rights on the child's well-being.

nonetheless, adopt the criteria contained in Fam. Law §5-323(d) to inform our consideration of "unfitness" in the custody context, the *Rashawn* Court expressly states,

> [t]he deficiencies that may properly lead to a finding of unfitness or exceptional circumstances in a custody case will not necessarily suffice to justify a TPR judgment. For one thing, those deficiencies may be temporary and correctable – sufficiently severe to warrant denying custody or visitation at a particular point in time, but with the understanding that the custody or visitation decision is subject to reconsideration upon a showing of changed circumstances. As noted, however, a judgment terminating parental rights, once enrolled, is not subject to discretionary reconsideration based merely on the parent's changed circumstances.

*Id.* Thus, although we agree with Petitioner that the criteria for determining whether a parent is "unfit" in a third-party custody dispute requires clarity, we decline to adopt the objective criteria contained in Fam. Law §5-323(d). Instead, we look to other jurisdictions that have previously considered whether a parent is "unfit" in the custody context to determine the appropriate factors a court must consider.

The most recent set of cases we could locate discussing "unfitness" in the third-party custody context come from the Supreme Court of Alabama and the Supreme Court of Mississippi, both decided in 2003. In *Ex Parte N.L.R.*, 863 So.2d 1066 (Ala. 2003), the Supreme Court of Alabama considered a case where the maternal grandmother was granted temporary custody of two minor children after she intervened in the parents' child support and visitation litigation seeking custody of the children. *Id.* at 1066. As relevant to the case at bar, the Supreme Court of Alabama explained that:

> The prima facie right of a natural parent to the custody of his or her child, as against the right of custody in a nonparent, is grounded in the common law concept that the primary parental right of custody is in the best interest and welfare of the child as a matter of law. So strong is this presumption, absent a showing of voluntary forfeiture of that right, that it can be overcome only

66

by a finding, supported by competent evidence, *that the parent seeking custody is guilty of ... misconduct or neglect to a degree which renders that parent an* unfit *and improper person to be entrusted with the care and upbringing of the child in question*."

*Id.* at 1068-69 (quoting *Ex Parte Terry*, 494 So.2d 628, 632 Ala. 1986) (internal quotation marks omitted) (emphasis added).

In *In re Custody of M.A.G.*, 859 So.2d 1001 (Miss. 2003), the Supreme Court of Mississippi considered a case where a child was placed in the custody of third-parties after the child's father was arrested for the murder of the child's mother. *Id.* at 1003. All charges against the father were subsequently dropped, but the third-party custodians, nonetheless, sought permanent custody of the child, alleging that the father was an unfit parent. *Id.* At the custody trial, the court found that the father was an unfit parent because the testimony reflected that: (1) the father abused drugs and alcohol before he was incarcerated, and continued to do so after he was released from prison; (2) he had abused the mother; (3) he provided little moral leadership to his family; (4) he was convicted of public drunkenness after he was released from prison; (6) he bathed with his girlfriend while the child was in the house; and (7) the child witnessed the father's nephew having sex with his girlfriend. *Id.* In considering the trial court's unfitness finding, the Supreme Court of Mississippi explained that "this Court has ruled that unfitness may be shown by[:] (1) abandoning the child; (2) behaving so immorally as to be detrimental to the child; or (3) being unfit mentally or otherwise to have custody of the child." *Id.* at 1004 (quoting *Carter v. Taylor*, 611 So.2d 874, 876 (Miss. 1992); *see also Westbrook v. Oglesbee*, 606 So.2d 1142, 1144-

45 (stating the same). The Court then considered the merits of the father's challenge of the finding of unfitness, and concluded the trial court did not err because

> [t]here was substantial evidence of drug and alcohol abuse- at times in the presence of [the child]. There were errors of judgment by [the father] such as renting a horror movie to watch with his son when the six-year-old [child] thought [the father] had killed his mother and brother with a baseball bat. There was evidence of drunken driving by [the father] with [the child] in the car. [The father] exposed [the child] to sexual situations. [The father] threatened and abused [the mother]. [The father] was involved in sexual relationships with married women – once in the presence of her husband – and was promiscuous. [The father] never reported his live-in girlfriend and their five-month-old son missing after they were killed.

*Id.* at 1004.

In a 1994 case decided by the Supreme Court of Oklahoma, the Oklahoma Court considered the circumstances where the paternal grandmother of a child sought to gain custody of the child by intervening in the parents' divorce proceeding. *McDonald v. Wrigley*, 870 P.2d 777, 778 (Okla. 1994). The trial court granted temporary custody to the grandmother, but later dismissed the proceeding for lack of jurisdiction. *Id.* The grandmother appealed, and Supreme Court of Oklahoma held that

> [i]n order for third persons to deprive a parent of custody of his [or her] children, some inability on the part of the parent to provide for the child's ordinary comfort, intellectual or moral development must be shown. Evidence of unfitness must be clear and conclusive and the necessity for depriving the parent of custody must be shown to be imperative. In a divorce case, the district court may award custody to a third person if both parents are found to be unfit. If a parent is not found to be unfit, is able to care for his [or her] children and desires to do so, he [or she] is entitled to custody as against others who have no permanent or legal right to custody.

*Id.* at 779-80 (quoting *Haralson v. Haralson*, 595 P.2d 443, 445 (Okla. 1979)) (footnotes omitted). The *McDonald* Court also determined that

68

[t]he [parents'] unfitness may not be demonstrated by a mere comparison between what is offered by the competing parties, but only by a showing that the parents cannot reasonably be expected to provide for the child's ordinary comfort or intellectual and moral development. Such order must be a product of a hearing of which the parent had notice with the opportunity to be heard. The order must include the conditions found by the trial court to constitute the parental unfitness. This is so that the parent knows what, if corrected, would amount to a change of condition in the eyes of the court.

*Id.* at 781 (internal citations omitted). The *McDonald* Court concluded that all grandparent custody actions – absent a final termination order pursuant to its version of a termination of parental rights proceeding – may be considered temporary and that "[d]uring the child's minority the doors to the courthouse will remain open to the parent who would show that the conditions underlying the declaration of unfitness have been corrected." *Id.* at 782.

In another decision published in 1994, the Supreme Court of North Carolina considered a case where adoptive parents filed a lawsuit seeking custody of a minor child over the child's biological parents, after the adoptive parents' initial attempt to adopt the child was voided by the Supreme Court of North Carolina and the child was subsequently placed in the custody of the local department of social services that then placed the child with the adoptive parents. *Petersen v. Rogers*, 445 S.E.2d 901, 902 (N.C. 1994). At trial, the court ordered that the child be returned to the biological parents and the court denied the adoptive parents' request for custody. *Id.* On appeal, the Court of Appeals of North Carolina observed that

[t]he [Supreme Court of North Carolina's] examination [in *Jolly v. Queen*, 142 S.E.2d 592 (N.C. 1965)] of the paramount custody right of the mother of an illegitimate child illustrates the strength of natural parents as against others: Although a trial court "might find it to be in the best interest of a legitimate child of poor but honest, industrious parents" that his [or her] custody be given to a more affluent person, such a finding "could not confer

69

a right as against such parents who had not abandoned their child, even though they had permitted him to spend much time" with the more affluent person. Instead, "parents' paramount right to custody would yield only to a finding that they were unfit custodians because of bad character or other, special circumstances. So it is with the paramount right of an illegitimate's mother."

*Id.* at 904 (quoting *Jolly*, 142 S.E.2d at 596). The *Petersen* Court concluded that because there was no finding that the biological parents had neglected their child's welfare in any way, their "paramount right to custody" of the child prevailed. *Id.* at 905.

In an Arkansas case that was decided in 1990, the Supreme Court of Arkansas considered the result where a custody dispute arose between the child's biological mother and the child's maternal grandmother. *Schuh v. Roberson*, 788 S.W.2d 740, 740 (Ark. 1990).[48] At the custody trial, the juvenile court ultimately granted custody in favor of the maternal grandmother. On appeal, the *Schuh* Court determined that

> [c]ourts are very reluctant to take from the natural parents the custody of their child, and will not do so unless the parents have manifested such indifference to its welfare as indicates a lack of intention to discharge the duties imposed by the laws of nature and of the state to their offspring suitable to their station in life.

---

[48] In *Schuh*, the court originally awarded temporary custody of the child to the child's biological mother in the mother's divorce proceeding. *Schuh*, 788 S.W.2d at 740. Before the custody was finalized, however, the maternal grandmother intervened in the case and was awarded temporary custody. *Id.* Shortly thereafter, the court discovered that the child was illegitimate and the court subsequently vacated its custody order. *Id.* at 741. The mother brought new proceedings seeking to establish paternity and obtain custody of the child, and the maternal grandmother again intervened. *Id.* After procedural delays that reformulated the custody process in Arkansan courts, the case was transferred from the county court to a juvenile judge and, after a hearing, permanent custody of the child was awarded to the maternal grandmother. *Id.*

70

*Id.* at 741 (quoting *Parks v. Crowley*, 253 S.W.2d 561, 563 (Ark. 1952)).[49] The *Schuh* Court subsequently remanded the case to allow the hearing judge to consider the issue of the mother's fitness as a parent. *Id.*

In a 1981 case decided by the Supreme Court of Georgia, the Georgia Court considered a case where the father of two minor children brought an action against the children's' paternal aunt who had been granted temporary custody and the children's biological mother who was the legal custodian of the children. *Carvalho v. Lewis*, 274 S.E.2d 471, 472 (Ga. 1981). In vacating the lower court's grant of custody to the paternal aunt, the *Carvalho* Court first acknowledged that in custody disputes between a parent and

---

[49] In *Parks*, the Arkansas Court considered a case where the paternal grandparents of a child refused to return the child to the custody of the biological mother due to concerns that the child was endangered in the mother's home. 253 S.W.2d at 562. The mother sought custody, and the trial court subsequently granted custody to the paternal grandparents due to its finding that the mother "was addicted to drink and frequent profanity to such an extent as to make her unfit to have the custody of the child." *Id.* On appeal, the *Parks* Court determined that

> [i]n considering this case, we do not lose sight of the fact that we are dealing with the welfare of a little girl of the tender age of five years when obviously she is most in need of the loving care of her real mother unless the mother is so depraved morally or otherwise as would render her unfit to have her child. While [the third-parties] have had her custody for most of her life, however, when the real mother shows that she is entitled to [c]ustody, we must know, human nature being what it is, that the love and attachment of this little girl for her grandparents (appellees) cannot have become so deep rooted and attached that it could not, within a very short time, be transferred to her real mother by proper treatment, love and care, if given the opportunity.

*Id.* at 563. The *Parks* Court ultimately concluded that, because the mother had quit drinking, joined a church, and her conduct had improved since the initial custody determination, the previous custody order should be modified and the custody of the child was to be transferred to her. *See id.* at 563-64.

71

a third-party, the trial court must first determine whether the parent is, *inter alia*, unfit

pursuant to case law established by the Supreme Court of Georgia. *Id.* (citing *Perkins v. Courson*, 135 S.E.2d 388 (1964)). The *Cavalho* Court then explained that

> [a] finding of unfitness must center on the parent alone, that is, can the parent provide for the child sufficiently so that the government is not forced to step in and separate the child from a parent. A court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational, or even moral advantages elsewhere.
>
> *      *      *
>
> The ability of a parent to raise his or her child may not be compared to the superior fitness of a third person. That ability must be examined in a scrutinous, abstract light. Only in custody disputes between parents may a court determine which party is more suitable to be awarded custody, this being the so-called "best interest of the child" test.

*Id.* at 472 (internal citations omitted).

In 1971, the Supreme Court of Minnesota considered a case where a biological

mother filed a lawsuit seeking to regain custody of her child who she and the father had

previously placed in the custody of the child's paternal grandparents due to their marital

difficulties, and who had remained in the custody of the paternal grandparents after the

parents divorced. *Wallin v. Wallin*, 187 N.W.2d 627, 628-29 (Minn. 1971). The *Wallin*

Court observed that in third-party custody disputes,

> it is fundamental that parents have a natural right to the child and in order to deprive a parent of custody in favor of a third person there must be grave reasons shown. Factors to establish such grave reasons would be neglect, abandonment, incapacity, moral delinquency, instability of character, or inability to furnish the child with needed care.

*Id.* at 630 (quoting *State ex rel. Jaroszewksi v. Prestidge*, 81 N.W.2d 705, 710 (Minn.

1957)) (internal citations omitted). The *Wallin* Court then concluded that

72

> [t]hus, it would seem to be a fundamental rule of law that, all things being equal, as against a third person, a natural mother would be entitled as a matter of law to custody of her minor child unless there has been established on the mother's part neglect, abandonment, incapacity, moral delinquency, instability of character, or inability to furnish the child with needed care[.]

*Id.* (internal citations omitted). The *Wallin* Court ultimately remanded the case to the lower court for further proceedings because it concluded that the record before it was inadequate to determine whether the district court abused its discretion in granting custody of the child to the paternal grandparents based solely on the ground that the a transfer of custody might be disruptive to the child. *Id.* at 631-32.

In addition to the third-party custody cases described, *supra*, we also located several other cases that, while not third-party custody cases, provide useful precedent for understanding how "unfitness" has been defined in the custody context. In a 2007 decision, the Supreme Court of Arkansas considered a case where grandparents of a minor child filed a petition for guardianship after refusing to return the child to his biological mother. *Devine v. Martens*, 263 S.W.3d 515, 518-19 (Ark. 2007), *overruled by Fletcher v. Scorza*, 359 S.W.3d 413 (2010).[50] After a hearing, the circuit court awarded permanent guardianship of the child to the grandparents, finding, *inter alia*, that the parents were unfit to have custody, the grandparents were qualified for guardianship, and it would be in the best

---

[50] In *Fletcher*, the Supreme Court of Arkansas held that "[t]o the extent that any of our prior cases suggest a standard of fitness or unfitness in guardianship proceedings involving the statutory natural-parent preference, we overrule them." 359 S.W.3d at 421. We acknowledge that the Arkansas Court's decision in *Fletcher* overrules the holding in *Devine*, but nonetheless find the *Devine* Court's discussion of "unfitness" in the guardianship context useful to our inquiry, even if the *Devine* Court's ultimate holding was subsequently overruled.

interest of the child for guardianship to be granted to the grandparents. *Id.* at 519. In finding that the mother was unfit, the circuit court determined that: (1) she repeatedly turned responsibility of the child over to the grandparents; (2) she had not provided a stable home environment; (3) the child was exposed to inappropriate "art" inside the home, including nude pictures of the mother; (4) the mother was guilty of educational neglect due to the child's excessive absences and tardies from school that resulted in criminal action; (5) the mother had an internet presence of herself that would be inappropriate for young children to see; (6) the mother did not consider the thought that the child and his friend might see her pictures on the internet; and (7) the mother provided a home environment that was dirty and smelled of urine, resulting in the child developing bladder and bowel problems. *Id.*

On appeal, and as relevant to the case at bar, the *Devine* Court observed that

*Courts are very reluctant to take from the natural parents the custody of their child,* and will not do so unless the parents have manifested such indifference to its welfare as indicates a lack of intention to discharge the duties imposed by the laws of nature and of the state to their offspring suitable to their station in life. *When, however, the natural parents so far fail to discharge these obligations as to manifest an abandonment of the child and the renunciation of their duties to it, then becomes the policy of the law to induce some good man or woman to take the waif into the bosom of their home*[.]

*Id.* at 524 (quoting *Lloyd v. Butts*, 37 S.W.3d 601, 608 (2001) (emphasis in original). The *Devine* Court determined that the circuit court erred in finding that the mother was unfit because it concluded the issues presented at the guardianship proceeding were more akin to issues that arise in dependency-neglect cases and that, in such cases, the Arkansas state policy

74

strongly favors reunification with the natural parents above all other alternatives for dependent-neglected juveniles. Parents whose children are adjudicated dependent-neglected are generally offered family services and an opportunity to prove they have made improvements that are in keeping with their children's best interests. Additionally, parents who make improvements are almost without exception reunited with their children.

*Id.* (citing Arkansas Code, Ann., §§9-27-102 – 9-28-1003 (Repl. 2002 & Supp. 2007)).

After reviewing the record, the *Devine* Court concluded that

it is clear that [the mother] took significant action toward rectifying any issues that would keep her from retaining custody of her son. These are the very types of improvements that parents are encouraged to make in the best interests of their child or children, and [the mother] should not be disparaged for her efforts to improve her home and her parenting skills.

*Id.* at 525.  In a footnote, the *Devine* Court also observed that

it is clear to us that the circuit court based its judgment as to [the mother's] guidance of [the child], in part, upon its own morals and viewpoint of how a child should be raised. This court has made it clear that the state cannot interfere with a natural parents' right to custody simply to better the moral and temporal welfare of the child as against an unoffending parent.

*Id.* at 525, n. 5 (citing *Payne v. Jones*, 415 S.W.2d 57 (1967)).  The *Devine* Court also

observed that

[t]his state's courts should not be in the business of permanently removing children from their parents' custody simply because the parents have exercised poor judgment in caring for their children. Just as the Arkansas Juvenile Code recognizes the efforts of parents in dependency-neglect actions to improve their homes and parenting skills, we should encourage and recognize such improvements by parents in guardianship actions. Frankly, it is not in a child's best interests to take custody from a natural parent who has rectified all issues relating to his or her fitness, and grant custody to a third party, such as that child's grandparents.

*Id.* at 526.

In 2003, the Supreme Court of Kentucky considered the circumstances where biological parents who had previously signed consents for their child to be adopted subsequently revoked their consents after the contractual time in which to do so had passed, but prior to the voluntary termination of rights proceeding. *Moore v. Asente*, 110 S.W.3d 336, 339 (Ken. 2003). After their revocation, the biological parents filed an independent custody action seeking to regain custody of their child from the adoptive parents who, at the time of the filing, had physical custody of the child. *Id.* The circuit court determined that the parents' consents to adoption were invalid, for reasons not relevant to the case at bar, and, therefore, granted custody of the child to the biological parents concluding that the adoptive parents lacked jurisdiction to contest custody. *Id.* On appeal, the Supreme Court of Kentucky explained that a nonparent seeking custody of a child "must first show by clear and convincing evidence that the parent has engaged in conduct similar to activity that could result in the termination of parental rights by the state." *Id.* at 360 (footnote omitted). In a footnote following its explanation, the *Moore* Court observed that

> [t]he type of evidence that is necessary to show unfitness on the part of the mother in a custody battle with a third party is: (1) evidence of inflicting or allowing to be inflicted physical injury, emotional harm or sexual abuse; (2) moral delinquency; (3) abandonment; (4) emotional or mental illness; and (5) failure, for reasons other than poverty alone, to provide essential care for the children.

*Id.* at 360, n.100 (quoting *David v. Collinsworth*, 771 S.W.2d 329, 330 (1989)) (other citation omitted). Ultimately, the *Moore* Court determined that, due to the specific factual circumstances in that case that are not relevant to the unfitness issue, the parents had waived

76

their superior right to custody and the Court remanded the case to the trial court to determine custody based on the best interests of the child standard. *Id.* at 361-62.

In *Gomez v. Savage*, 580 N.W.2d 523 (Neb. 1998), the Supreme Court of Nebraska considered a case where a father filed a habeas corpus action seeking to obtain custody of two of his three children from the children's adoptive parents after the mother had previously placed the children up for adoption without his consent, which the Supreme Court subsequently vacated,[51] and after the mother subsequently revoked her relinquishment of parental rights and gave the adoptive parents power of attorney over the children and allowed the children to continue living with the adoptive parents. *Id.* at 528-29. At the habeas proceeding, the circuit court determined that the father was unfit because he: (1) had a history of unemployment, alcohol abuse, (2) had repeated prior contacts with law enforcement, and (3) repeatedly failed to provide parental support.[52] *Id.* at 530. The

---

[51] The *Gomez* Court noted that it reviewed the trial court's decision to allow the adoption to proceed, even without the father's consent, and held that because the father had not given his consent the court lacked jurisdiction to hear the adoption proceedings. *See In re Adoption of Kassandra B. & Nicholas B.*, 540 N.W.2d 554 (1995).

[52] The *Gomez* Court noted that testimony presented at the trial reflected that: (1) four days prior to the hearing the father had been charged with assault and battery, disorderly conduct, and possession of a controlled substance arising out of a bar fight; (2) the father had twenty-three previous contacts with law enforcement, including convictions for shoplifting, giving false information, trespassing, failure to appear, obstruction of justice, destruction of property, fraudulent obtaining of benefits, fraud by receipt of unemployment benefits, and DUI; (4) the father had had his driver's license had been revoked in Iowa for six years due to his DUI convictions; (5) the father had assaulted his wife in front of his stepchildren while the father was intoxicated; (6) the father had a history of selling drugs, using drugs in the presence of his children, and keeping drugs in the home while the children were there; (7) the father had a history of unemployment, although he

(continued . . .)

circuit court also determined that the adoptive parents had lawful custody of the children due to the power of attorney granted by the mother. *Id.* at 530. On appeal, the *Gomez* Court noted it had previously defined "unfitness" as "'a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.'" *Id.* at 533 (quoting *Uhing v. Uhing*, 488 N.W.2d 366, 372 (1992)). The *Gomez* Court also explained that

> [i]f the evidence of unfitness is insufficient to justify termination of parental rights in an action maintained under the Nebraska Juvenile Code,[53] similarly deficient evidence of parental unfitness in a habeas corpus proceeding prevents a court from granting child custody to one who is a stranger to the parent-child relationship.

*Id.* (quoting *Uhing*, 488 N.W.2d at 373). The *Gomez* Court also noted that

_____

(. . . continued)

testified at the trial that he had recently secured employment at a roofing company; (8) the father does not have a checking or savings account and was delinquent in his child support payments for one of the children. 580 N.W.2d at 530.

[53] Nebraska's Revised Statute, Ann. §43-292 (Cum. Supp. 1996) states, in relevant part, that:

> The court may terminate all parental rights between the parents or the mother of a juvenile born out of wedlock and such juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exists:
> * * *
> (4) The parents are unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct is found by the court to be seriously detrimental to the health, morals, or well-being of the juvenile[.]
> * * *

[a] court cannot deprive a parent of the custody of a child merely because the parent has limited resources or financial problems, or because the parent's lifestyle is different or unusual. The fact that a person outside the immediate family relationship may be able to provide greater or better financial care or assistance for a child than can a parent is an insufficient basis to deprive a parent of the right to child custody.

*Id.* at 533-34 (internal citations omitted). Ultimately, the *Gomez* Court determined the trial court did not err in finding the father was unfit because it concluded that

[t]he fact that [the father] claims that he made some last minute improvements does little in light of his past behavior to show that he is now capable of fulfilling his duties as a parent. In the instant case, the record clearly shows that [the father] has an extensive criminal record, has left his children in the past without providing support, has difficulty maintaining employment or refuses to maintain employment, and has difficulties involving alcohol and drug use.

*Id.* at 534.

In another petition for guardianship case decided in 1986, the Supreme Court of Minnesota reviewed a trial court's decision to grant guardianship to the children's grandfather over the biological father. *Matter of Welfare of P.L.C.*, 384 N.W.2d 222, 224-25 (Minn. 1986). The *P.L.C.* Court observed that

The trial court relied on several reasons for its decision: the father's drinking, his living situation and church attendance with the children, evidence of physical abuse, and the need for continuity in care of the children. The court made the following finding of parental unfitness: 'That the risk to said girls at their father's home and the consequent danger, and their need for continuity and stability is such that said [father] is not fit to have either the guardianship or physical custody of said girls[.]'

*Id.* at 226. In reviewing the trial court's finding of unfitness, the *P.L.C.* Court noted that "[t]he grandparents had the burden of presenting evidence to overcome the presumption of parental unfitness. They had to show 'grave reasons' for preferring them to a natural parent

79

for custody of the children. These reasons approach those required for the termination of parental rights." *Id.* at 225 (citations omitted). The Court also noted that to find parental unfitness in a termination of parental rights proceeding, "there must be a 'consistent pattern of specific conduct before the child or specific conditions directly relating to the parent and child relationship either of which are determined by the court to be permanently detrimental to the physical or mental health of the child[.]" *Id.* at 227 (quoting Minn. Stat. §260.221(b)(4) (1984)).

The *P.L.C.* Court concluded that the trial court abused its discretion in finding that the father was unfit because it failed to "accord [the father] the presumption of parental fitness." *Id.* at 226. The *P.L.C* Court determined that, although the trial court found that the father had a drinking problem, there was "no finding or evidence to support a finding that [the father's] drinking, whether diagnosed as alcoholism or not, affects his ability to care for the children." *Id.* The *P.L.C* Court also noted that there was no evidence regarding the degree of force, or evidence of resulting injury due to the father's discipline and, therefore, was not a "grave reason" justifying denial of his right to custody. *Id.* (citations omitted). The *P.L.C* Court also determined that the father's living arrangement and his churchgoing habits were not shown to be detrimental to the children, and concluded that "[c]onsideration of such factors, at least without further evidence, represents only 'ad hoc judgments on the beliefs and lifestyles … of the proposed custodian.'" *Id.* at 227 (quoting *Pikula v. Pikula*, 374 N.W.2d 705, 713 (Minn. 1985)). Finally, the *P.L.C.* Court acknowledged that the trial court found evidence of spousal abuse but concluded that "there was no showing that any such abuse was directly related to the parent-child relationship or

80

permanently detrimental to the children, who were found by the trial court to have a good relationship with their father." *Id.*

In a 1984 case decided by the Supreme Court of Oklahoma, the Oklahoma Court considered the circumstances where a father filed a habeas corpus action seeking to regain custody of his daughter after the maternal grandparents, who had retained custody of the child since the mother's death, filed a petition to adopt the child. *Application of Grover*, 681 P.2d 81, 82 (Okla. 1984). The trial court acknowledged that the father could provide a fit and proper home to raise the child, but ultimately concluded that it was in the best interests of the child to remain in the custody of the grandparents. *Id.* On appeal, the *Grover* Court recognized that

> [t]o justify the courts in depriving parents of the care and custody of their own children, the parents special unfitness must be shown by evidence that is clear and conclusive and sufficient to make it appear that the necessity for doing so is imperative. Ordinarily and generally, it must be established that their condition in life, character and habits are such that provision for the childrens' ordinary comfort, their intellectual and moral development cannot reasonably be expected at their hands.

*Id.* (quoting *Gibson v. Dorris*, 386 P.2d 186, 188 (1963)) (quotation marks omitted). Ultimately, the *Grover* Court concluded that because the trial court found the father was a fit parent, and that finding was supported by the record, "the preference accorded by law to the natural parent to the custody of his or her child determines that the best interests of the child will be served by awarding custody to the natural parent." *Id.* at 83.

In *Perkins*, a case relied on by the *Cavalho* Court, *see supra,* the Supreme Court of Georgia considered a case where a father filed a habeas corpus action against the maternal grandparents seeking to regain custody of his child who had previously been placed in their

custody. *Perkins v. Courson*, 135 S.E.2d 388, 389 (Ga. 1964), *superseded by statute as stated in*, *Clark v. Wade*, 544 S.E.2d 99 (Ga. 2001).[54] As relevant to the case at bar, the *Perkins* Court observed that

> The issue of fitness is much broader than whether a parent has voluntarily contracted away his [or her] right, or consented to an adoption, or failed to provide necessaries, or abandoned, or consented to the child's receiving the proceeds of his [or her] own labor, or consented to its marriage, or treated it cruelly … or whether, because of cruel treatment, the ordinary has appointed a guardian for the child … or whether, because a child under 12 years of age has been found under immoral, obscene or indecent influences, the ordinary has it committed to an institution[.]
>
> [I]t may be shown, for instance[], that the parent is inflicted either mentally or physically to the extent that he [or she] cannot provide any care for the child; that he [or she] suffers from a serious and contagious disease which would endanger the child; that he [or she h]as criminal tendencies making it hazardous to expose a child to him [or her]; or that he [or she h]as other such disqualifications …. Furthermore, it may be shown that, although completely immoral and degenerate, a parent has had insufficient contact with the child for the events covered by [Georgia statute] to have occurred. Award of a child to such an unfit person simply because he [or she] has not

---

[54] In *Clark*, the Georgia Court acknowledged its prior case law addressing findings of unfitness in the third-party custody context, but concluded that

> In enacting [Georgia Code §19-7-1], the legislature changed the law governing parent-third party custody disputes and added an additional way by which parental power could be lost. The Georgia General Assembly intended to replace the parental unfitness standard with the best-interest-of-the-child standard. Adoption of this new standard shifts the trial court's inquiry solely from the current fitness of the biological parent to raise the child to include consideration of the child's interest in a safe, secure environment that promotes his or her physical, mental and emotional development. In considering what is in the best interest of the child, the trial court may consider the child's historical relationship with the parent, the child's relationship with the third-party custodian, and the child's special medical, emotional, or educational needs.

544 S.E.2d at 104 (internal footnotes omitted).

> lost his [or her] right to custody by one of the modes of [the Georgia statute] would be contrary to law and reason.

*Id.* at 396.[55]

From these cases, we conclude certain factors emerge that are relevant to a hearing court's inquiry into whether a parent is unfit sufficient to overcome the parental presumption in a third-party custody dispute. We conclude that a court, in determining whether a parent is unfit, may consider whether: (1) the parent has neglected the child by manifesting such indifference to the child's welfare that it reflects a lack of intent or an inability to discharge his or her parental duties; (2) the parent has abandoned the child; (3) there is evidence that the parent inflicted or allowed another person to inflict physical or mental injury on the child, including, but not limited to physical, sexual, or emotional abuse; (4) the parent suffers from an emotional or mental illness that has a detrimental impact on the parent's ability to care and provide for the child; (5) the parent otherwise demonstrates a renunciation of his or her duties to care and provide for the child; and (6) the parent has engaged in behavior or conduct that is detrimental to the child's welfare. Addressing the second factor, we conclude that "neglect" for the purposes of a finding of unfitness means that the parent is either unable or unwilling to provide for the child's ordinary comfort or for the child's intellectual and moral development.

We acknowledge that "due to the vagaries of human nature and the infinite variety of people's actions, no two sets of facts and circumstances in child custody disputes are

---

[55] The Code sections referenced by the *Perkins* Court are Georgia Code, §§74-108, 74-109, and 74-110.

alike." *Hoffman*, 280 Md. at 187, 372 A.2d at 591. Accordingly, we hold that the factors enumerated above are not the exclusive criteria by which a court must rely to determine whether a parent is unfit, but should, nonetheless, serve as a guide for the court in making its findings. Additionally, although several of the cases we cited, *supra*, conclude that parental unfitness in a third-party custody dispute must be demonstrated by clear and convincing evidence, our precedent establishes that such evidence may be shown by a mere preponderance of the evidence. *Cf. In re Rashawn*, 402 Md. at 499, 937 A.2d at 190 (observing that the "preponderance standard" applies in custody cases), *with Moore*, 110 S.W.3d at 359 ("One exception to the parent's superior right to custody arises if the parent is shown to be 'unfit' by clear and convincing evidence."); *McDonald*, 870 P.2d at 781 ("[t]o obtain custody in a divorce proceeding, even on a temporary basis as is sought here, over the objection of a parent, a grandparent must show the parents' unfitness by evidence that is clear and conclusive, and makes the necessity for doing so appear imperative.") (citation omitted); *Gomez*, 580 N.W.2d at 534 (concluding that the cumulative effect of the father's behavior "provides clear and convincing evidence that he is unfit to have custody of the children."); *Wallin*, 187 N.W.2d at 629 ("a mother is entitled to the custody of her children unless it clearly appears that she is unfit or has abandoned her right to custody[.]"); *Perkins*, 135 S.E.2d at 393 ("in order to divest him of this right upon the ground of unfitness for the trust, the proof brought to show the alleged unfitness should be clear and convincing.") (internal quotation marks omitted).

We also note that even if a parent is found unfit and a court grants custody to a third-party based on its finding that it is in the child's best interest to be placed in the third-

party's custody, a parent is not foreclosed from seeking to regain custody of his or her child in the future upon a showing of changed circumstances. *See In re Rashawn*, 402 Md. at 496, 937 A.2d at 188 (observing that custody and visitation orders are subject to reconsideration "upon a showing of changed circumstances on the parent's part.").

Turning to the case at bar, we note that, in concluding that Petitioner was unfit, the hearing court found that: (1) Petitioner repeatedly lied in her testimony; (2) Petitioner did not do the things the BIA told her to do; (3) Petitioner took drugs voluntarily, had not stopped, and would likely continue to take drugs; (4) Petitioner's alleged diagnosis of DID was concerning regardless of whether Petitioner actually had the disorder or not; (5) Petitioner's inability to see the Child naked in the shower was "[w]eird, odd, bizarre, [and] troubling[;]" (6) the Ks' moving into the marital home created a chaotic atmosphere that the hearing judge assumed would probably have made the BIA sick had she walked into the home; (7) Petitioner was selfish for not allowing the Child to go to Mississippi with his Grandparents during the summer in 2014; (8) Petitioner's handling of the Crisis Center referral was inappropriate; (9) Petitioner had failed to make adjustments to address the Child's needs, including the hearing judge's disbelief that Petitioner had adjusted her work schedule; and (10) Petitioner repeatedly made excuses for everything in her life, including the drug use and the polyamorous sexual activities. Although the hearing judge's findings implicate several of the factors we discussed, *supra*, upon closer examination of the hearing judge's findings, we conclude that the hearing judge repeatedly made findings that were not supported by the evidence presented at the hearing and were, therefore, erroneous.

85

Accordingly, because the hearing judge relied on erroneous findings in concluding that Petitioner was an unfit parent he, thereby, abused his discretion.

We conclude that the hearing judge did not err in finding that Petitioner repeatedly lied in her testimony because evidence in the record supported the hearing judge's determination that she lied about: (1) her drug use; (2) being forced to have a sexual relationship with M; (3) taking the Child to school on September 8, 2014; and (4) lying to the BIA. We hold, however, that this finding is only relevant in assessing the veracity of Petitioner's testimony in contrast to other witnesses, and that the hearing judge erred to the extent that he relied on Petitioner's untruths as evidence that she was an unfit parent.

We agree with the hearing judge that evidence was presented at the hearing indicating that Petitioner did not do all the things requested of her by the BIA. The record reflects that the BIA requested that Petitioner and Father contact the National Family Resiliency Center ("NFRC") to obtain psychiatric care for the Child in July 2014, but Petitioner did not contact the NFRC until August 28, 2014 and Petitioner subsequently failed to take the Child to an appointment at the NFRC on September 9, 2014. *See supra* n. 34. Although Petitioner's failure to comply with the BIA's requests were concerning, the hearing judge's finding ignored the fact that Petitioner was independently seeking psychiatric care for the Child, which was corroborated by the testimony of her therapist. Thus, while Petitioner did not comply with the specific actions the BIA wanted her to take, she did comply with the intent underlying the BIA's requests – finding psychiatric care for the Child.

In regard to his third finding, the hearing judge found that Petitioner voluntarily took drugs based on Father sending her research on new drugs for them to take, and the judge concluded that finding new drugs and new ways to get high or hallucinate was a hobby of both Petitioner's and Father's. We agree that the record indicates that Petitioner voluntarily took drugs with Father and M during her marriage to Father and that substantial evidence presented at the hearing indicated that both Petitioner and Father were interested in finding and taking a variety of drugs. We note, however, that there was no evidence presented at the hearing regarding Petitioner's use of drugs, other than marijuana, after she separated from Father in May 2013 – over a year prior to the custody hearing. Additionally, there was no evidence presented at the hearing that the Child was aware of the drug use or that Petitioner's drug use detrimentally impacted the Child. Thus, we conclude the hearing judge erred in the weight he gave Father and M's testimony regarding Petitioner's drug use when it was not corroborated by more contemporaneous evidence, aside from one positive drug test for marijuana, and no evidence was presented indicating that Petitioner's drug use had a detrimental impact on the Child or that he was even aware that Petitioner used drugs.

We conclude the hearing judge did not err in finding that, regardless of whether Petitioner was actually diagnosed with DID, there was sufficient evidence in the record to indicate that she was, at various points throughout her life, acting as though she did. Pretending to suffer from a serious mental illness, itself, signals that the parent may suffer from some other emotional or mental illness and evidence presented at the hearing indicated that Petitioner's alter ego "Morgan" disliked the Child and expressed an interest in harming the Child. We acknowledge that Petitioner testified at the hearing that Morgan

was not an alter ego, but rather a nickname she had been given by friends, and that Father and M were the only witnesses who testified as to the existence of Petitioner's alleged alter egos. We hold that it was within the hearing judge's discretion to weigh the credibility of the witnesses testifying in regard to Petitioner's alleged DID and he did not err in expressing concern regarding the evidence supporting the possibility that Petitioner was pretending to suffer from a serious mental illness. *See supra* n.4.

We conclude that the hearing judge erred in finding that Petitioner's alleged inability to see the Child naked or in the shower was "[w]eird, odd, bizarre, [and] troubling[.]" We note that the only witnesses who testified that Petitioner could not see the Child naked or in the shower were Father and M – witnesses who had not lived in the marital house with Petitioner after June 2013. Thus, their knowledge of Petitioner's ability to regularly care and provide for the Child, including seeing him naked or in the shower, was limited. Additionally, there was no evidence presented by any other witness who had regular contact with the Child indicating that the Child was unclean, unhealthy, or that there were any other indications that Petitioner was not providing for the Child's ordinary care.

We also find very little evidence in the record substantiating the hearing judge's findings that the Ks living in the marital home created chaos. The only evidence presented at the hearing regarding the Ks was that: (1) they moved into the marital home in July 2014 with several dogs and between fifteen and twenty-five guinea pigs; (2) the Ks brought their biological daughter with them and the Child referred to the Ks daughter as his sister; and (3) M asserted that she had heard in prior conversations with Petitioner and Father that the

Ks were hoarders, but acknowledged she did not know about the cleanliness of the marital home after the Ks moved in. Despite this dearth of evidence, the hearing judge made several findings based purely on his own suppositions regarding the atmosphere of the marital home once the Ks moved in. Specifically, the hearing judge found that the marital home was "about as chaotic as possible" and that he understood why "[Petitioner] didn't want the [BIA], to see the inside of that house. [The BIA] probably would have got sick if she had walked in there. And that's where you're raising a child and two girls and a little boy?" Neither of these findings made by the hearing judge were supported by the record. No evidence was presented regarding why the BIA did not enter the marital home and there was no evidence discussing the cleanliness of the home, aside from the acknowledgement that multiple animals were present. Additionally, nothing in the record indicated that anyone had become ill due to the conditions inside the marital home. Accordingly, the hearing judge erred in the findings he made regarding the atmosphere and cleanliness of the marital home while the Ks were living there.

The only factual basis for the hearing judge's finding that Petitioner was selfish was when she refused to allow the Child to take a trip to Mississippi with his Grandparents during his spring break in 2014. We note that Petitioner allowed the Child to go to the Outer Banks with his Grandparents during the summer of 2014, and there were multiple occasions over the years where the Child was allowed to go on both day-trips and vacations with his Grandparents. We also note that, at the time Petitioner refused to allow the Child to go to Mississippi with the Grandparents, she was the custodial parent of the Child, and as we have repeatedly held, "Grandparents … do not enjoy a constitutionally recognized

89

liberty interest in visitation with their grandchildren. Rather, whatever right they may have to such visitation is solely of statutory origin implemented through judicial order." *Koshko v. Haining*, 398 Md. 404, 423, 921 A.2d 171, 182 (2007). Because the visitation order only specifies that the Grandparents were entitled to visitation with the Child on Tuesdays and Thursdays from after school until 8 p.m. and every other weekend, Petitioner was fully within her right as the Child's parent to refuse to allow the Child to go on the trip to Mississippi with his Grandparents. The hearing judge, therefore, erred in finding that Petitioner's "selfishness" in exercising her constitutional right as a parent supported a finding of unfitness.

Addressing the hearing judge's findings regarding the Crisis Center referral, we agree that the circumstances surrounding the referral reflect that the Child was in major crisis, and we agree that Petitioner did not handle the Child's behavioral difficulties that day in the best possible way. We conclude that the hearing judge's findings did not accurately reflect the evidence presented at the hearing, and focused, instead, on his subjective views of Petitioner. In his findings regarding the Crisis Center referral, the hearing judge determined that

> [the Child's] in major, major trouble when you're threatening to blow up a school and punch a vice principal at the age of six in the stomach? That's unheard of. Those are the kids that we send here to the Finan Center to give them intense examination when they're in the juvenile delinquent system. These are kids that probably have little chance of making it, because they don't have a family to go back to for the most part.
>
> And yes, on that day any mother worth her salt would tell first of all the grandparents and do everything she could do to address that problem. My son did what? We've got to address this right now. But to hand him off to the grandmother and not say anything? That's just bizarre. What kind of love

90

does she have for her son? What kind of interest does she have for the son? It's like my shift's over, somebody else worry about it. I'll punch out. I'm at the factory. I didn't finish what I was supposed to do today, but the next worker can take over. Grandma can take over. That's the attitude she displayed.

\* \* \*

That child is in the mental emergency room or should be right now. And that's the way she should be addressing it. And most mothers would try to move heaven and hell to help their child, to do everything they possibly could. But not say anything? Now, I assume she went to Children's [Hospital]. I don't know whether she went out to the county for that or not. But in any event, I don't think there was significant follow-up. And anything that she did do in the way of getting some counseling or looking into anything else – I think she was getting good instruction from her attorney, but obviously not following other things.

\* \* \*

We acknowledge that Petitioner should have either taken the Child directly to the Crisis Center or at least communicated the existence of the referral to the Grandmother before the Grandmother took the Child visitation. We note that evidence presented at the hearing indicated that the Grandparents and Petitioner were not communicating effectively at the time of the incident,[56] and the school principal intimated in her testimony that Petitioner may not have felt that she could have taken the Child to the Crisis Center right away due to the court-ordered visitation on Thursdays from after school to 8 p.m. We also note that the hearing judge acknowledged in his findings that Petitioner had taken the Child to Children's Hospital that night, and evidence in the record indicated that they arrived

---

[56] As an example, we note that after taking the Child to the Crisis Center the Grandparents and Father did not inform Petitioner that they had done so and they did not provide her with the completed referral form after they dropped the Child off at the marital home.

91

there around 9:15 p.m. Thus, while we agree as a general matter that Petitioner could have handled the Crisis Center referral incident more competently, the record does not support the hearing judge's view that she acted "bizarre[ly]" in failing to inform the Grandmother of the Crisis Center referral or that she was treating her parental responsibilities as a shift at a factory, where she could "punch out" and have the Grandparents worry about the Child's behavior. In contrast to the hearing judge's assessment, there was ample evidence in the record reflecting that Petitioner was actively trying to address the Child's behavioral difficulties.

We also conclude that the hearing judge erred in finding that Petitioner had failed to make adjustments to address the Child's needs. We note that the hearing judge stated that he did not believe that Petitioner had adjusted her work schedule to accommodate the Child's needs, and that the Child was spending ten hours a day at school while in major crisis. Based on that finding, the hearing judge concluded that "I would like to think a parent would quit their job if they had to, to deal with that problem with a child. It's no different than if that child was in the hospital with two broken arms, two broken legs, or in a coma. You have to make adjustments." Even accepting the hearing judge's finding that Petitioner was not willing to adjust her work schedule long-term to accommodate the needs of the Child that fact, alone, is not sufficient for the hearing judge's conclusion that she made no adjustments.[57] Both the school principal and school guidance counselor testified

---

[57] We note that, although the Child was spending a long period of time at school some days, the visitation order allowed the Grandparents to pick the Child up from school at 3:30 p.m. two days a week, and on the other days, Petitioner had enrolled him in before- and after-care programs.

that Petitioner was a responsive parent, and would come at the "drop of a hat[]" to help address the Child's behavioral difficulties. The record also indicates that Petitioner was working with her therapist to become a better parent, and she was actively seeking to find an appropriate therapist for the Child, in addition to her coordination with the school regarding whether the Child should receive an IEP. We also conclude that it was inappropriate for the hearing judge to state that a parent who has a child with behavioral difficulties should *quit their job* in order to demonstrate he or she is trying to accommodate the child's needs, especially in light of the clear evidence in this case that multiple parties were actively seeking to address the Child's behavioral issues without Petitioner sacrificing her employment.

The hearing judge also erred in finding that Petitioner's "mak[ing] excuses for everything" supported a conclusion that she was an unfit parent. We note that most of the hearing judge's findings in this regard focused on his perceptions of Petitioner and were only loosely connected to facts from the record. For example, the hearing judge stated that he had not heard from Petitioner that she liked to put the Child to bed, or read him a story, or take walks together, or what the Child's favorite outfits were, and based on these observations the hearing judge determined that

> I didn't see any really love or total attachment. I mean, this is her flesh and blood, her own son. Most mothers would give up their lives for their children in a tragedy. A child fell into a river, they'd dive in. I think in this case, I don't know what she'd do. She might leisurely walk over and make a call. I don't know. But what I've seen from the time this child was born, she's not even acting in the way a babysitter would act. Because if she were the babysitter and she went to school on the fourth and the teacher told her what happened or daycare provider, she'd be calling everybody she possibly could. She'd be calling the mother, she'd be calling the father, she'd be

93

calling the grandparents. Did you hear – let me tell you what the principal said. Schools can't make you do anything now, because that's the way the system is. But certainly when they send a kid to the [C]risis [C]enter, it's major. It's major.

*     *     *

Although we agree that Petitioner did not testify extensively about her day-to-day life taking care of the Child, beyond discussing his behavioral difficulties, the record reflects that she was actively involved in his life and seeking to address his behavioral problems. Based on the record before us, we conclude that the hearing judge's characterization that he did not know whether Petitioner would rescue the Child from drowning if he fell into a river was unwarranted and was not supported by any evidence in the record indicating that Petitioner was such a detached parent. In contrast, ample evidence was presented indicating that Petitioner was actively involved in the Child's life – choosing the school's he would attend, purchasing his school supplies, working with the school to address his behavioral difficulties, and coordinating visitation with the Grandparents and Father.

Finally, we note that the hearing judge found that

we've got [Petitioner] not only taking drugs – and I find that she still takes them or she's still ready to take them. And she has no appreciation what they've done. I don't find any evidence that she feels terrible about doing all these sex things with her child in the house, because she blames it on her husband. She blames the drugs on her husband. She blames the sex on her husband. She blames [M] on her husband. She says this is a – everybody is making up these personalities. When [the couple's therapist] testified, who did everything she could to help [Petitioner] – she even said that she had personalities.

The hearing judge did not err in finding that Petitioner still took drugs or was likely to take them because the record reflects that although the parties' separated in May 2013,

94

Petitioner testified positive for marijuana in January 2014.  We conclude, however, the hearing judge erred in finding that there was no "evidence that [Petitioner] feels terrible about doing all these sex things with her child in the house[]" to support his determination that Petitioner was unfit because Petitioner's sexual relationships were irrelevant to the unfitness inquiry absent evidence indicating that her sexual relationships were detrimental to the Child or that the Child was even aware of Petitioner's sexual activities.

Accordingly, we hold that because many of the findings the hearing judge relied on in concluding that Petitioner was unfit were erroneous, and because the judge's non-erroneous findings were, by themselves, insufficient to satisfy any of the factors we discussed, *supra*, we conclude that the hearing judge abused his discretion in finding that Petitioner was an unfit parent.

### III.   "Exceptional Circumstances"

As noted, *supra*, for a court to grant custody of a child to a third-party, the court must first find that the parents are either unfit or that "extraordinary circumstances" exist. In the seminal case *Ross v. Hoffman*, *supra*, we concluded that there are certain factors "which may be of probative value" in determining whether "exceptional circumstances" exist in a third-party custody dispute.  280 Md. at 191, 372 A.2d at 593.  Those factors are: (1) the length of time the child has been away from the biological parent; (2) the age of the child when care was assumed by the third-party; (3) the possible emotional effect on the child of a change of custody; (4) the period of time which elapsed before the parent sought to reclaim the child; (5) the nature and strength of the ties between the child and the third-party custodian; (6) the intensity and genuineness of the parent's desire to have the child;

95

and (7) the stability and certainty as to the child's future in the custody of the parent. *See id.*; *see also McDermott*, 385 Md. at 419, 869 A.2d at 809 (referencing the *Hoffman* factors as the "standards and guidelines that generate 'exceptional circumstances[.]'"). Although the *Hoffman* factors serve merely "as a guide" to aid a court in determining whether exceptional circumstances exist, *see Hoffman*, 280 Md. at 188, 372 A.2d at 592, we note that the *Hoffman* factors served as the analytical framework that the hearing judge relied on in ultimately finding that exceptional circumstances existed.[58]  Accordingly, although we have previously acknowledged the existence of other factors that may be relevant in an exceptional circumstances inquiry,[59] we will confine our review of the hearing judge's exceptional circumstances finding to his application of the *Hoffman* factors to the facts in this case. Petitioner observes that the decisions relied on by the *Hoffman* Court to establish its factor test all involved an award of custody to a third-party in circumstances where those third-parties had been custodians of the child in question for a long period of time.  *See id.* at 188-91, 372 A.2d at 592-93.[60]  Petitioner contends that because, in her view, the

---

[58] We note that, as a general matter, the hearing judge did not err in relying on the *Hoffman* factors as the basis for his exceptional circumstances analysis.

[59] In addition to the factors enumerated in *Hoffman*, we have also held that factors such as "the stability of the child's current home environment, whether there is an ongoing family unit, and the child's physical, mental, and emotional needs" are relevant to an "exceptional circumstances" analysis.  *See Sider v. Sider*, 334 Md. 512, 532, 639 A.2d 1076, 1086 (1994) (quoting *Turner v. Whisted*, 327 Md. 106, 116-17, 607 A.2d 935, 940 (1992)); *see also Monroe v. Monroe*, 329 Md. 758, 775-76, 621 A.2d 898, 906 (1993) (concluding that the child's relationship with a third-party is a relevant factor in exceptional circumstances inquiry).

[60] *See Piotrowski v. State*, 179 Md. 377, 378-79, 383, 18 A.2d 199, 199, 201-02

(continued . . .)

96

"exceptional circumstances" test and the *Hoffman* factors relate only to situations where a parent has not retained continuous custody of the child, the hearing judge erred in finding "exceptional circumstances" existed in this case because Petitioner has always had custody of the Child. Petitioner also argues that in *McDermott*, we further refined the establishment of "extraordinary circumstances" by stating that a third-party must prove "there are extraordinary circumstances posing serious detriment to the child …." *See McDermott*, 385 Md. at 374-75, 869 A.2d at 783. In Petitioner's view, therefore, an inquiry into whether "extraordinary circumstances" exist should focus on whether the child would be endangered by remaining in the custody of the parent.

The Grandparents contend that based on the evidence developed at the custody hearing, the judge appropriately found that "exceptional circumstances" existed in this case. The Grandparents note that Petitioner avers that the "exceptional circumstances" test relates to situations where the child has been in custody of a third-party for a long period of time, but they argue that the duration a child lives with a third-party is not the exclusive consideration. The Grandparents observe that in *Monroe v. Monroe*, 329 Md. 758, 621

---

(. . . continued)
(1941) (concluding it would be injurious to remove the five-year-old child from her grandparents' home where she had been living since she was four months); *Dietrich v. Anderson*, 185 Md. 103, 106, 116, 43 A.2d 186, 187, 191 (noting that the child had been in the care of the foster parents for some five years and expressing concern regarding the child's immediate future if custody was given to the biological father); *Pick*, 199 Md. at 351-53, 86 A.2d at 469 (determining that the third-party custodians had the care and custody of the child from the time he was less than two years old until he was eleven and that an abrupt removal of the child could be injurious); *Trenton v. Christ*, 216 Md. 418, 421-23, 140 A.2d 660, 661-62 (observing that the child had lived with her maternal grandparents for about six years and concluding there was a genuine risk to the child's well-being if custody was changed).

A.2d 898 (1993), we stated that "[i]n assessing whether there are exceptional circumstances, the critical question remains, what is the best interest of the child?" *Id.* at 775, 621 A.2d at 906. The Grandparents concede that many of the decisions applying *Hoffman* place significant emphasis on the duration that a child has been away from a parent, but argue our conclusion in *Monroe* makes clear this factor is not the lynchpin of the analysis. The Grandparents aver the evaluation must also consider the relationship that exists between the child and the parties as well. *See id.*

The Grandparents also argue there was considerable evidence established in the case at bar that reflected both the length and depth of the relationship that existed between the Grandparents and the Child. The Grandparents note the Custody Evaluator testified that they were important in the Child's life – providing him with a safety net and buffer – and acknowledged the Child spent almost every other weekend with the Grandparents as well as a significant amount of time during the work week. The Grandparents also note that they have been extensively involved in the Child's life since he was born and were involved in providing daycare, taking him to doctor's appointments and to school, gifting him clothing, caring for him during the summers, and taking him on vacations. The Grandparents also contend Petitioner previously acknowledged she had referred to the Grandparents as the Child's "other primary caretakers" and that the Grandparents were significantly involved in the Child's medical care, education, and summer activities prior to her and Father's separation. The Grandparents also aver that evidence presented at the custody trial indicated Petitioner's relationship with the Child was "hot and cold," she did not like parenting the Child on her own, and she lacked the ability to discipline the Child.

98

The Grandparents argue there was ample evidence adduced at the hearing to support the judge's conclusion that exceptional circumstances existed and that the Grandparents had filled the role of parents throughout the life of the Child.

In the case at bar, the hearing judge determined that exceptional circumstances existed based on his findings that: (1) the Child was away from Petitioner and Father "whenever they were going to do some tripping[;]" (2) the Grandparents assumed care of the Child "from the time of [his] birth[]" or "[a]t least after [Petitioner] went back to work after the first year[;]" (3) the relationship between the Child and the Grandparents is "extremely strong[;]" (4) there was no "intensity and genuineness on the part of [Petitioner]" in having custody of the Child; and (5) that if the Child remained in the custody of Petitioner then "[h]e would continue with instability and he would certainly fail. He'd be in crisis. He'd be out of that public school system probably for good." We conclude that the hearing judge misapplied the facts in this case to the *Hoffman* factors.

While we agree with the Grandparents' argument that the first *Hoffman* factor is not the exclusive consideration a court is required to make in determining whether exceptional circumstances exist, we hold that the court must first determine that the child at issue has spent a long period of time away from his or her biological parent before considering the other *Hoffman* factors. *Cf. McDermott*, 385 Md. at 325-26, 869 A.2d at 754 (holding that duration that father had been separated from child did not constitute "exceptional circumstances" where father was required to be away for long periods of time due to his occupation as a merchant marine); *with Hoffman*, 280 Md. at 192, 372 A.2d at 594

(concluding that "practically all" of the *Hoffman* factors were present and affirming lower court's award of custody to third-parties).

We conclude that for the first *Hoffman* factor to support a finding that exceptional circumstances exist, the hearing court must find that the child at issue has been away from his or her biological parent for a "long period of time." As Petitioner notes, in our other decisions that have affirmed the existence of exceptional circumstances, the hearing courts consistently found that the child at issue had spent years in the care of the third-party. *See supra* n. 60; *see also Hoffman*, 280 Md. at 192, 372 A.2d at 594 (finding the first factor was satisfied where there was a "protracted separation of mother from child, beginning at the child's tender age of about four months and lasting for eight and half years[.]"). Given this precedent, we conclude that the first *Hoffman* factor's purpose is to determine whether the child at issue has been outside the care and control of the biological parent for a sufficient period of time for a court to conclude that the constructive physical custody of the child has shifted from the biological parent to a third-party. Stated another way, the first *Hoffman* factor seeks to determine whether a biological parent has, in effect, abandoned his or her child. As we observed in *Pick,*

> [w]here a child has been left by its parents in the care and custody of others, but the parents reclaim it soon afterwards, and the parents are competent to have its custody, the court gives more weight to the law of nature, which recognizes the force of parental affection, than to the probability of benefit to the child by leaving it where it is, even the probability of advantages which wealth and social position might bestow. But where the parents surrender complete custody of an infant for such a long time that its interests and affections all attach to the person who fill the place of the parents, and the infant develops into a healthy and happy child, then if the parents seek to reclaim the child by judicial decree, the court should place the right of the parents subordinate to the right of those who performed the parental duties,

for the ties of companionship strengthen by lapse of time, and upon the strength of those ties the welfare of the child largely depends.

199 Md. at 351-52, 86 A.2d at 469 (citations omitted).

We conclude that the hearing judge in the case at bar erred in finding that the facts in the present case were sufficient to find that Petitioner had, in effect, transferred constructive custody of the Child to the Grandparents based exclusively on the fact that the Child was not in their care "whenever they were going to do some tripping." The record reflects that Petitioner and Father's tripping schedule was anywhere from every other weekend to once a month prior to the parties' separation in May 2013 – not nearly the duration in time we have held is sufficient to weigh the first *Hoffman* factor in favor of an exceptional circumstances finding. Additionally, the record reflects that throughout the Child's life, and even more so after Petitioner and Father separated, Petitioner remained active in the Child's upbringing and care, including providing shelter to the Child in the marital home, deciding what school the Child should attend, making doctor's appointments for the Child, organizing his transportation to those appointments, responding to the Child's behavioral problems at school, and seeking out ways to address those behavioral difficulties. Accordingly, we conclude the hearing judge erred in determining that the first *Hoffman* factor weighed in favor of an exceptional circumstances finding because the underlying facts that the hearing judge relied on were not sufficient to support his conclusion that Petitioner had abandoned the Child or transferred physical custody of the Child to the Grandparents for a long period of time.

We also hold that, for the same reasons we concluded that the hearing judge erred in applying the first *Hoffman* factor, the hearing judge also erred in finding that the Grandparents had assumed care for the Child "from the time of [his] birth[]" because that conclusion ignores the facts in the record reflecting that Petitioner has played an active role in the care of the Child since he was born.[61]

We also observe that the hearing judge did not make substantive factual findings regarding the third and fourth *Hoffman* factors. Thus, we do not have a clear picture of how the hearing judge balanced these two factors in ultimately concluding that "exceptional circumstances" existed in this case.

We agree with the hearing judge's assessment that the relationship between the Child and the Grandparents is "extremely strong[.]" The Grandparents are heavily involved in the Child's life and spend substantial quality time with the Child that includes

---

[61] In *McDermott* we noted that

> parents should be encouraged in time of need to look for help in caring for their children *without risking loss of custody*. The presumption preferring parental custody is not overcome by a mere showing that such assistance was obtained. Nor is it overcome by showing that those who provided the assistance love the children and would provide them with a good home. These circumstances are not alone sufficient to overcome the preference for parental custody.
>
> *            *            *

*McDermott*, 385 Md. at 431, 869 A.2d at 816 (quoting *In re Guardianship of Sams*, 256 N.W.2d 570, 573 (Iowa 1977) (emphasis added) (quotation marks omitted). Thus, while the Grandparents have taken an active role in caring and providing for the Child since his birth and provided assistance to Petitioner in parenting the Child, we conclude sufficient evidence was presented indicating that Petitioner has remained active in the care and custody of the Child refuting the hearing judge's findings regarding the second *Hoffman* factor.

102

exposing the Child to new activities. We will also defer to the hearing judge's finding that there is no "intensity and genuineness" on Petitioner's part in having custody of the Child. As we noted, *supra*, a hearing court retains broad discretion in custody determinations because the hearing judge is in the unique position of seeing the witnesses and parties and hearing the testimony in a live setting, in contrast to the appellate court, which only has a cold record before it. *See In re Yve S.*, 373 Md. at 586, 819 A.2d at 1051 (citations omitted).

We conclude that the hearing judge erred in finding that if the Child remained in the custody of Petitioner, then he would certainly fail and be in crisis, and possibly expelled from his school. We acknowledge that the Child's negative behavior began at the end of the kindergarten school year and his behavioral problems continued to escalate to the point that the school referred him to the Crisis Center for an assessment on September 4, 2014. There was ample evidence in the record reflecting that Petitioner was responsive to these behavioral outbursts and was actively working with the school to help address the Child's problems – enrolling him in the Linkages to Learning program, exploring the possibility of getting an IEP put into place, and searching for an appropriate therapist for the Child. Evidence presented by Petitioner's therapist also indicated that Petitioner was seeking advice on how to become a more effective parent to the Child and corroborated Petitioner's efforts in locating an appropriate therapist for the Child. We also note that, rather than being on the brink of expelling the Child, the school was actively working with Petitioner to determine the best course of action for addressing the Child's behavior. The school principal testified that they had recently developed a behavior contract – the first step in assessing the Child's needs. Thus, while the evidence reflects that at the time of the custody

hearing the Child was unstable and was in crisis, there was also ample evidence in the record indicating that Petitioner was attempting to seek ways – albeit imperfectly – to address his behavioral difficulties and provide stability.

In sum, we conclude that the hearing judge erred in applying the first, second, and seventh *Hoffman* factors and he erred in failing to make substantive factual findings regarding the third and fourth *Hoffman* factors. Accordingly, we hold that the hearing judge abused his discretion in finding that exceptional circumstances existed in this case.

We conclude that because the hearing judge's factual findings in this case did not support his conclusions that Petitioner was unfit and that exceptional circumstances existed, the hearing judge, thereby, also abused his discretion in granting custody of the Child to the Grandparents because the presumption favoring Petitioner retaining custody of the Child was not rebutted by the facts in this case.

Because we hold that the circuit court abused its discretion in granting custody of the Child to the Grandparents, we also conclude that the circuit court erred in ordering Petitioner to pay child support to the Grandparents. We note that in her brief, Petitioner requests that we grant her a recoupment of the child support payments she has paid to the Grandparents in the amount of $35,000 because they were made to an unconstitutional order. We decline consideration of the recoupment issue because we conclude the issue requires additional fact-finding by the circuit court to determine whether Petitioner is entitled to recoupment of the child support she has paid to the Grandparents to-date and, if so, the amount that Petitioner is entitled to recoup. Accordingly, we remand this case to

the circuit court for further proceedings regarding whether Petitioner is entitled to recoupment of the child support payments she has made to the Grandparents to-date.

## CONCLUSION

In summary, we hold a third-party may intervene in a custody action between two parents because Maryland Rule 2-214 allows a person "to intervene in an action when the person's claim or defense has a question of law or fact in common with the action." Maryland Rule 2-214(b)(1). We also hold that, because a third-party may not obtain custody of a child over the child's biological parents unless the third-party can demonstrate that the parents are either unfit or that exceptional circumstances exist that may be detrimental to the child, the third-party seeking to intervene in a custody action must make a *prima facie* showing that the parents are either unfit or that exceptional circumstances exist in their pleading. *See McDermott*, 385 Md. at 375, 869 A.2d at 783. In the case at bar, the circuit court did not err in allowing the Grandparents to intervene in the custody action between Petitioner and Father because the Grandparents alleged sufficient facts in their motion to make a *prima facie* showing that Petitioner and Father were unfit and that exceptional circumstances may have existed in this case.

We also hold that in determining whether a parent is unfit – sufficient to overcome the presumption favoring parental custody in a third-party custody dispute – the court may consider the following factors, whether: (1) the parent has neglected the child by manifesting such indifference to the child's welfare that it reflects a lack of intent or an inability to discharge his or her parental duties; (2) the parent has abandoned the child; (3) there is evidence that the parent inflicted or allowed another person to inflict physical or

105

mental injury on the child, including, but not limited to physical, sexual, or emotional abuse; (4) the parent suffers from an emotional or mental illness that has a detrimental impact on the parent's ability to care and provide for the child; (5) the parent otherwise demonstrates a renunciation of his or her duties to care and provide for the child; and (6) the parent has engaged in behavior or conduct that is detrimental to the child's welfare. We concluded that in the case at bar that, although several of the hearing judge's findings that served as the basis for his conclusion that the mother was unfit implicated several of the factors above, because the majority of the hearing judge's findings were not supported by the record and were, therefore, erroneous, the hearing judge abused his discretion in finding that Petitioner was an unfit parent.

We also conclude that the circuit court erred in applying the *Hoffman* factor test to the facts in this case. *See Hoffman*, 280 Md. at 191, 372 A.2d at 593. The hearing judge erred in finding that the "length of time" the child at issue "had been away from" Petitioner was "whenever [Petitioner and Father] were going to do some tripping[]" because the first *Hoffman* factor only applies to circumstances where a biological parent has given constructive custody of the child to a third-party over a long period of time, and ample evidence was presented in this case reflecting Petitioner has been an active custodian of the child since he was born. The hearing judge also erred in concluding the Grandparents had assumed care of the child "from the time of [his] birth[]" because it ignored the facts presented at the custody hearing reflecting that Petitioner has been continuously and actively involved in the child's care since he was born. The hearing judge also erred in drawing the conclusion that if the child remained in Petitioner's custody he would likely

106

fail or continue to be in crisis because ample testimony presented at the custody hearing indicated Petitioner was responsive to the child's behavioral difficulties and was actively working with both the child's school and her own therapist to identify ways to help the child with his behavioral issues. The hearing judge also erred in failing to make substantive factual findings regarding the third *Hoffman* factor, which considers the "possible emotional effect on the child of a change of custody," and the fourth *Hoffman* factor, which considers the "period of time which elapsed before the parent sought to reclaim the child[.]" *Hoffman*, 280 Md. at 191, 372 A.2d at 593. Accordingly, because the hearing judge's factual findings in this case did not support his conclusions that Petitioner was unfit and that exceptional circumstances existed, the hearing judge, thereby, also abused his discretion in granting custody of the Child to the Grandparents because the presumption favoring Petitioner retaining custody of the Child was not rebutted by the facts in this case.

We also hold that because the circuit court abused its discretion in granting custody of the Child to the Grandparents, the circuit court also erred in ordering Petitioner to pay child support to the Grandparents.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY. COSTS TO BE PAID BY RESPONDENT GRANDPARENTS.**

Judge Watts joins in judgment only.

107

Circuit Court for Montgomery County
Case No. 112675-FL
Argued: June 2, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 97

September Term, 2016

_____

NATASHA BURAK

v.

MARK BURAK, *et al.*

_____

Barbera, C.J.,
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Dissenting Opinion by Getty, J., which
McDonald, J., joins.

_____

Filed: August 29, 2017

Respectfully, I dissent.

I agree with the Majority that the circuit court did not err in granting the Grandparents' motion for permissive intervention. However, I strongly disagree with the Majority's holding that the trial court abused its discretion in finding that the biological parents were unfit and exceptional circumstances justified granting custody to the Grandparents.

Initially, the Petitioner, Ms. Burak, has failed to properly challenge the trial court's finding of unfitness before this Court. As the Majority concedes, Ms. Burak, "did not independently appeal the unfitness issue decided by the Court of Special Appeals to this Court" in her petition for a writ of certiorari. Majority Slip Op. at 57. For that reason alone this Court should decline to consider her challenge to the trial court's custody determination.

Instead, the Majority excuses Ms. Burak's failure to properly raise the issue of unfitness on that grounds that the issue was raised and decided by both the trial court and the Court of Special Appeals, that Ms. Burak "incorporated the argument into her argument regarding permissive intervention[,]" and that both parties argued the issue in oral arguments before this Court. *Id.* In other words, the Majority suggests that when a party has failed to raise an issue in a petition for a writ of certiorari, the party can easily remedy that error by raising the issue in her brief to this Court or at oral argument before this Court. That is incorrect.

Maryland Rule 8-131(b) provides, in pertinent part,

(1) *Prior Appellate Decision*. Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Court of Special Appeals or by a circuit court acting in an appellate capacity, the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals. . . .

Thus, when a party fails to raise an issue in a petition for a writ of certiorari, this Court "ordinarily" will not consider it, regardless of whether it is later raised in a brief or at oral argument. As the use of the word "ordinarily" implies, this Court has the authority to decide issues not properly raised in a petition for a writ of certiorari. However, the Court has consistently held that it should exercise that authority rarely, only when there is a compelling reason of public policy or other justification to consider the issue. *See Wynn v. State*, 351 Md. 307, 322-23 (1998) (noting that the Court has not treated Rule 8-131(b) as "granting a general discretion to reach an issue whenever the Court so desires in the interests of 'fairness[,]'" and that "'exceptions' to the principle embodied in Rule 8-131(b) are limited to 'extraordinary circumstances'"); *see also Mazor v. State Dep't of Corr.*, 279 Md. 355, 371 n.8 (1977).

Here, there is no compelling reason to reach the unfitness claim. In *Ross v. Hoffman*, the Court set forth a clear standard for third-party custody claims, namely that there is a presumption that the child's best interest is to remain in the custody of a biological parent that must be overcome by a showing of unfitness or "exceptional circumstances as make such custody detrimental to the best interest of the child." 280 Md. 172, 178-79 (1977). The Court recently affirmed the propriety of that standard in *McDermott v. Dougherty*, an

opinion that engaged in an exhaustive analysis of out-of-state cases applying the unfitness and exceptional circumstances standards. 385 Md. 320, 357-418 (2005). The Court expanded the use of that test to third-party visitation cases in *Koshko v. Haining*, 398 Md. 404, 441 (2007). And, the Court has clarified that in a custody case, "unfitness means unfitness to have custody of the child, not an unfitness to remain the child's parent." *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 498 (2007). Thus, this Court has already set forth a clear standard for courts to apply in third-party custody cases. To the extent that trial courts may desire additional guidance as to whether a particular parent is unfit, they may draw upon cases in out-of-state jurisdictions as persuasive authority.

Further, as clarified in *Hoffman*, a trial court need find only unfitness **or** exceptional circumstances in order to grant a third-party custody claim. 280 Md. at 178-79. Here, the trial court found both unfitness and exceptional circumstances, but Ms. Burak has failed to properly raise a challenge to the trial court's unfitness finding. Consequently, this Court also need not address Ms. Burak's claim that the trial court abused its discretion in finding that exceptional circumstances justified granting custody to the Grandparents. Instead, the Court should merely affirm the trial court's grant of custody to the Grandparents on the basis of the unchallenged finding that Ms. Burak was not a fit parent to have custody of the child.

The Majority, apparently viewing the unfitness and exceptional circumstances prongs of the *Hoffman* test as insufficiently clear, sets forth new standards for both. The Majority enumerates, for the first time, a list of factors for a trial court to employ when determining whether a biological parent is unfit in a third-party custody action. Majority

3

Slip Op. at 79-80.  And, the Majority transforms the well-settled factor test for exceptional circumstances stated in *Hoffman*, 280 Md. at 191, by adding a new requirement that a trial court **must** find that a child has been away from his or parents for "a long period of time" in order to find that exceptional circumstances exist.  Majority Slip Op. at 96.  The Majority then concludes, unsurprisingly, that the trial court's findings did not comport with the new legal standards that the Majority has just devised.

Initially, I disagree with the details of the new standards set forth by the Majority and believe that they are likely to prove confusing for trial courts to apply.  There is significant overlap between the new factors that the Majority sets forth for unfitness and the already-extant factors described in *Hoffman* for exceptional circumstances.  *Compare* Majority Slip Op. at 79 (listing, as two of six enumerated factors for unfitness, "(1) the parent has neglected the child by manifesting such indifference to the child's welfare that it reflects a lack of intent or an inability to discharge his or her parental duties" and "(2) the parent has abandoned the child") *with Hoffman*, 280 Md. at 91 (listing, as two of seven enumerated factors for exceptional circumstances, "the intensity and genuineness of the parent's desire to have the child" and "the length of time the child has been away from the biological parent").  This is particularly true as to the factor of parental abandonment; the Majority lists abandonment as a factor for unfitness, but also states that "the first *Hoffman* factor [for exceptional circumstances, i.e., "the length of time the child has been away from the biological parent"] seeks to determine whether a biological parent has, in effect, abandoned his or her child."  *See* Majority Slip Op. at 79, 96-97.

4

The newly added overlap between the two standards blurs the lines between unfitness, which may well be found even when a parent is very involved in a child's life, and exceptional circumstances, which generally occurs when a parent has abandoned as child or otherwise ceded the child's care and upbringing to a third party. The Majority's holding is thus likely to sow confusion as to what is required for a trial court to find unfitness as opposed to exceptional circumstances. And, the emphasis on abandonment under both prongs is likely to be applied—improperly—to deny custody to third parties when those parties have shown significant evidence indicating that the biological parent(s) is unfit or lacks a genuine desire to have the child, but the parent(s) has not outright abandoned the child.

The Majority is also unclear as to the mechanics of how, procedurally, a trial court should apply its new standards. The Majority correctly recognizes that third-party custody cases like the instant case, brought by the child's grandparents, are distinct from third-party guardianship/termination of parental rights (TPR) cases brought by a county Department of Social Services. In a TPR case, a trial court is required to expressly consider certain statutorily enumerated factors in determining whether to terminate a parent's rights to a child. *See* Majority Slip Op. at 62-63; Maryland Code, Family Law§ 5-323(d); *see also In re Adoption/Guardianship of Rashawn H.*, 402 Md. at 501 ("The court's role in TPR cases is to give the most careful consideration to the relevant statutory factors, to make specific findings based on the evidence with respect to each of them, and . . . determine expressly whether those findings suffice either to show an unfitness on the part of the parent to remain in a parental relationship with the child or to constitute an exceptional circumstance that

5

would make a continuation of the parental relationship detrimental to the best interest of the child.") Consequently, instead of mandatory factors, the Majority lists factors for unfitness that a trial court "**may** consider[,]" and states that those factors "are not the exclusive criteria by which a court must rely to determine whether a parent is unfit[.]" Majority Slip Op. at 79-80 (emphasis added). However, the Majority also holds that its enumerated factors should "serve as a guide for the court in making its findings." *Id.* at 80. Thus, the Majority's opinion leaves unclear whether, in a third-party custody action brought by a private citizen, the trial court must make explicit findings on the record or in a written opinion as to **all** of its stated factors for unfitness, as is required in the TPR context.

Similarly, the Majority has modified the *Hoffman* factor test for exceptional circumstances, adding a requirement that "[a trial] court must first determine that the child at issue has spent a long period of time away from his or her biological parent before considering the other *Hoffman* factors." *Id.* at 95. But it is unclear from the Majority's opinion whether a trial court may find exceptional circumstances merely based on a finding of abandonment for a "long period of time" or if the court must also go on to make explicit findings as to the other *Hoffman* factors.

Furthermore, I strongly disagree with the Majority's reversal of the trial court's decision based on a new, retroactively applied legal standard. This kind of *ex post facto* overruling of a trial court's decision based on entirely new legal criteria is highly improper. The Grandparents argued their claim for third-party custody, and the trial court conducted a custody hearing, under the then-current legal standards for unfitness and exceptional

6

circumstances. It is profoundly unfair to the Grandparents to reverse the grant of custody based on newly devised standards, without affording the Grandparents an opportunity to make their case under those new standards. And, by applying the new standards to the facts of the case, this Court usurps the trial court's role to apply the law to the facts and make discretionary findings. Thus, at a minimum, if the Majority believes that new legal standards are necessary, the trial court's ruling should be vacated, and the case remanded for that court to hold a third-party custody hearing applying the new standards. *See Thompson v. State*, 411 Md. 664, 683, 694 (2009) (holding that the correct legal standard in a postconviction DNA case where the petitioner requests a new trial is whether there is a "substantial possibility" that newly discovered evidence would have led to a different result, and remanding case for the trial court to utilize that standard).

Finally, even if the Majority is correct to consider the merits of the trial court's rulings instead of simply vacating the decision and remanding for the trial court to apply its new standards, I disagree with its conclusions that the trial court abused its discretion in finding that Ms. Burak was unfit and that exceptional circumstances merited granting custody to the Grandparents. The Majority correctly recognizes that in a child custody case a trial court's factual findings are scrutinized under the clearly erroneous standard, and its ultimate conclusions reached by applying the law to those factual findings are reviewed under an abuse of discretion standard. Majority Slip Op. at 45-46 (citing *In re Yve S.*, 373 Md. 551, 585-86 (2003)). However, the Majority misapplies these standards, and has failed to afford proper deference to the decisions of the trial court.

7

As to unfitness, the Majority holds that because some of the trial court's factual findings in support of the unfitness determination "were not supported by the evidence presented at the hearing" they were erroneous. Majority Slip Op. at 82. The Majority then proceeds through what is functionally a *de novo* review of the evidence in the record. The Majority places different weight on some of that evidence than the trial court did, finds "very little" evidence to support certain of the trial court's findings, and finds that other evidence should be discounted because it was based on testimony of Father and M that the trial court deemed credible but the Majority does not. Majority Slip Op. at 82-91.

However, as we have repeatedly held, "[i]f there is **any** competent evidence to support the factual findings of the trial court, those findings cannot be held to be clearly erroneous." *Spaw, LLC v. City of Annapolis*, 452 Md. 314, 339 (2017) (emphasis added) (quoting *Goff v. State*, 387 Md. 327, 338 (2005)). And, in proceeding through the evidence in the record, the Majority is forced to concede that there was at least **some** evidence to support the trial court's factual findings. *Id.* at 82-91. Moreover, it is not the function of an appellate court reviewing for clear error to "substitute [its] judgment for that of the fact finder, even if [the Court] might have reached a different result." *Nicholson Air Servs., Inc. v. Bd. of Cty. Comm'rs*, 120 Md. App. 47, 84 (1998). And in reviewing a trial court's discretionary finding for clear error, this Court must give "due regard to the opportunity of the trial court to judge the credibility of the witnesses," as commanded by Md. Rule 8-131(c). This Court has explained that this deference to a trial court's credibility determination carries special force in child custody cases, where a trial judge "sees the witnesses and the parties, hears the testimony, and has the opportunity to speak with the

8

child; he is in a far better position than is an appellate court, which has only a cold record before it, to weigh the evidence and determine what disposition will best promote the welfare of the minor." *In re Yve S.*, 373 Md. at 586 (quoting *Davis v. Davis*, 280 Md. 119 (1977)). Thus, rather than engage in an improper weighing of the evidence and credibility of witnesses, the Court should simply hold that there was some evidence to support the trial court's findings and, therefore, those findings were not clearly erroneous.

The Majority also concludes that the trial court abused its discretion in applying the law to the facts and concluding from its factual findings that Ms. Burak was unfit to retain custody of the child. *Id.* at 82, 90. In contrast to the Majority's view, I agree with the Court of Special Appeals that there was more than sufficient evidence in the record to sustain the trial court's discretionary finding of unfitness:

> On the actual record that was developed, the court acted well within its discretion when it found the parents unfit. The record supports the court's finding that Wife still takes or is ready to take drugs and that she has struggled with parenting and properly caring for Child. The court heard and considered testimony regarding Wife's inability and uneasiness in caring for Child, and that her difficulties often resulted in her and Husband placing Child in the Grandparents' care. And the record revealed real questions about Wife's compliance with the parties' agreed drug testing regiment. She failed to comply with the Child's Best Interest Attorney's ("BIA") request for a random drug test on July 14, 2014. And although she eventually sent the results of a test the BIA requested about a month before the custody merits hearing, she refused to sign the release that would allow her results to be sent directly to the BIA. This meant that Wife received and could review her results before the BIA got them, which undermined the credibility of any negative results. Wife obviously disputes these findings and the factual premises underlying them, but the record contained ample evidence that could support the court's finding that she and Husband (who doesn't contest the finding) were unfit parents.

*Burak v. Burak*, 231 Md. App. 242, 269 (2016).

The Majority similarly misapplies the clearly erroneous and abuse of discretion standards as to the trial court's findings regarding exceptional circumstances. The Majority again takes issue with how the trial court weighed certain evidence as to how long the child was away from the parents during their frequent episodes of drug use, when the Grandparents assumed care for the child, and "the stability and certainty as to the child's future in the custody of the parent." Majority Slip Op. at 95-100 (quoting *Hoffman*, 280 Md. at 91). And, the Majority concludes that the trial court abused its discretion in determining that exceptional circumstances merited granting custody to the Grandparents. *Id.* at 100. I would instead adopt the reasoning of the Court of Special Appeals and hold that there were more than sufficient facts in evidence to support a finding of exceptional circumstances under the applicable *Hoffman* factors:

> The record also supports the court's finding of exceptional circumstances. The evidence and testimony demonstrated that Child had been exposed for years to a volatile and unhealthy home environment; the court cited "the drugs, the sex, the craziness in the house, the different relationships, the lack of interest in the mother, the mother lying—all of those things are factors for both [unfitness and exceptional circumstances]." The Child spent long periods of time away from Husband and Wife, especially when Husband and Wife used drugs. The court found that the Grandparents had provided a great deal of care for the Child, and that "the age of the child when the care was assumed by the third party . . . was from the time of birth." The court considered the possible emotional effect on the child in a change of custody, the period of time that elapsed before the parents sought to reclaim him, the nature and strength of the ties between Child and the Grandparents, and found all factors to strongly favor custody by the Grandparents. The court did not find Wife's stated desire for custody to be genuine, and that Child "would continue with instability and he would certainly fail" in the custody of his parents.

*Burak*, 231 Md. App. at 269-70.

10

In summary, this Court should hold that Ms. Burak has failed to properly preserve her claim that the trial court erred in finding her to be unfit to have custody of her child because she did not raise it in her petition for a writ of certiorari. And, because a third-party custody claim requires only a finding of unfitness or exceptional circumstances, it is not necessary for the Court to reach Ms. Burak's claim that the trial court abused its discretion as to its finding of exceptional circumstances. Instead, the Court should sustain the trial court's custody decision on the unchallenged ground of unfitness.

Moreover, the overlap between the new factors set forth by the Majority for unfitness and the *Hoffman* exceptional circumstances factors is likely to prove confusing. The Majority has also failed to clarify whether it intends for trial courts to explicitly consider all of the factors it has enumerated. Further, even if the Court feels it necessary to supply new standards for unfitness and exceptional circumstances, it should vacate and remand the case to afford the Grandparents the opportunity to argue their case under the newly announced standards. Finally, even if it were appropriate to review the trial court's findings under the newly announced standards, the trial court did not abuse its discretion in finding that Ms. Burak was an unfit parent or in finding that exceptional circumstances merited granting custody to the Grandparents.[1] Therefore, I respectfully dissent.

Judge McDonald has authorized me to state that he joins this dissent.

---

[1] The Majority also concludes that because of its holding that the circuit court abused its discretion in granting custody of the Child to the Grandparents, "the circuit court erred in ordering Petitioner to pay child support to the Grandparents." Majority Slip Op. at 100. I would instead affirm the Court of Special Appeals' holding that affirmed the trial court's child support rulings. *See Burak*, 231 Md. App. at 280-84.

11